# CHICAGO, R. I. & P. RY. CO. v. BOND.

No. 6528.    Opinion Filed April 13, 1915.

(148 Pac. 103.)

1.  **MASTER AND SERVANT—Injury to Servant—Independent Contractor—Question for the Court.** Where a suit in damages for personal injuries was based upon the theory that deceased was entitled to the benefits of the Federal Employers' Liability Act (chapter 149, 35 Stat. 65 [U. S. Comp. St. 1913, secs. 8657-8665]) ; that defendant was engaged in interstate commerce; that deceased was an employee of defendant and engaged therein at the time of his death ; and that defendant's negligence, among other things, consisted in operating its train which killed deceased in violation of the Federal Safety Appliance Act of March 2, 1893, c. 196, 27 Stat. 531, as amended by acts approved April 1, 1896, c. 87, 29 Stat. 85, and March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. 1913, secs. 8605-8615) ; and where demendant pleaded, among other things, that deceased was an independent contractor, and stood on a written contract existing between defendant and deceased at the time of his death—**held,** that whether he was or was not an independent contractor was a question of law for the court to be determined from the face of the contract construed in the light of the surrounding circumstances.

2.  **MASTER AND SERVANT—"Independent Contractor."** An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work.

3.  **SAME—Injury to Servant—Existence of Relation.** Where, at the time he was killed, deceased had a contract in writing with the defendant company obligating him, at his own cost but for no specific time, to furnish all labor necessary to handle all coal required by the company at Enid, and to unload the same from its cars to its coal chutes and pick up all coal dropped in so doing "and place the same on cars or engines where desired" by the company ; also to break into certain dimensions and unload "all coal for stationary boilers ; also to unload wood from cars to storage piles in its yards there and to load cinders on its right of way at points designated by the company" ; also to be punctual and to discharge his duties thereunder without delay or inconvenience to the company, and should he fail, neglect, or refuse to perform the contract, the company had the right to terminate the same at any time without being liable in damages therefor ; the company to be the sole judge as to whether he faithfully and satisfactorily performed the same ; all tools to do the work to be furnished by the company and returned by deceased at its termination ; the company to keep a record of all coal

Frick-Reid Supply Co. et al. v. Hunter.

delivered at the chutes for unloading and deceased to make daily reports of the cars unloaded under the contract and receive, collect, and deliver to the authorized agent of the company a ticket from each engineman or other employee, showing the number of tons of coal delivered to any engine, and not to sublet the work without the written consent of the company—**held,** that the relation existing between deceased and defendant thereunder was that of master and servant, and not proprietor and independent contractor; and this, too, although the contract provided: "It is hereby agreed and understood that the contractor shall be deemed and held as the original contractor, and the railway company reserves and holds no control over him in the doing of such work other than as to the result to be accomplished."

4.    SAME—Injury to Railroad Employee—Interstate Commerce—Question for Jury. Where, in a suit in damages for personal injuries based upon the Federal Employers' Liability Act (35 St. t L. 65 . one defense was that although defendant was engaged in interstate commerce, deceased, if an employee of defendant, was not engaged in interstate commerce at the time he was killed, and where the contract existing between them in effect constituted deceased an employee of defendant at work in its yards at Enid at the time he was killed; and the evidence reasonably tended to prove that his duties were to unload cars of coal into its chutes and to unload the same from there into the tenders of its engines engaged in hauling its interstate and intrastate trains; that a record of the coal thus unloaded and loaded was kept in the shape of tickets deposited in boxes at the chutes; that it was the duty of deceased each day, between 4 and 6 o'clock, to turn these tickets, in the nature of a report, over to an agent of defendant at its freighthouse, some distance up the tracks and northward from its chutes; and that while crossing the tracks on his way to the frieghthouse so to do he was run over and killed by one of defendant's backing trains—**held,** that the evidence was sufficient to take to the jury the question of whether deceased was killed while engaged in interstate commerce.

5.    SAME—Discovered Peril—Negligence—Question for Jury. Evidence examined and **held** that, as the same reasonably tends to prove that the engineer knew or ought to have known when he first saw deceased deflecting on the track in front of him that he would be upon the track when the train reached him and could have avoided injuring deceased by the exercise of proper care had the train been running at a lawful speed, the question of defendant's negligence was for the jury.

6.    SAME—Negligence of Engineer—Question for Jury. Evidence examined, and **held** that, as the same reasonably tends to prove that the engineer failed, while running the train in question, to use and operate the continuous train power brake, with which the train was equipped, in violation of the Federal Safety Ap-

pliance Acts of March 2, 1896, as amended by acts approved April 1, 1896, and March 2, 1903, the question of whether he did or not was for the jury.

(Syllabus by the Court.)

*Error from District Court, Garfield County;*
*James W. Steen, Judge.*

Action by A. P. Bond, administrator of the estate of William L. Turner, deceased, against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*C. O. Blake, R. J. Roberts, W. H. Moore, J. G. Gamble,* and *K. W. Shartel,* for plaintiff in error.

*John C. Moore,* for defendant in error.

TURNER, J.   On June 4, 1913, defendant in error, A. P. Bond, as administrator of the estate of William L. Turner, deceased, sued plaintiff in error, Chicago, Rock Island & Pacific Railway Company, in the district court of Garfield county, in damages for personal injuries resulting in the death of his intestate. The suit was brought under the Federal Employers' Liability Act (35 St. at L. 65), and upon the theory that defendant was engaged in interstate commerce; that deceased was an employee of defendant and engaged in interstate commerce at the time of his death, and that defendant's negligence, among other things, consisted in operating its train, which killed deceased, in violation of the Federal Safety Appliance Act of March 2, 1893, as amended by acts approved April 1, 1896, and March 2, 1903. On June 24, 1913, defendant petitioned to remove the cause to the United States Court for the Western District of Oklahoma, which refused to take jurisdiction, and the cause was remanded to the state court. After amended petition filed and demurrer thereto overruled, on November 14, 1913, defendant, after a general denial, answered, admitting its corporate existence, and that it was engaged in interstate commerce, and that deceased met

death at the time and place set forth in the petition; but denied that he was an employee of defendant at the time and alleged that he was an independent contractor. There was trial to a jury and judgment for plaintiff, and defendant brings the case here, assigning that the court erred in refusing to direct a verdict for defendant at the close of all the evidence.

As the undisputed facts disclose that deceased was run over and killed by one of defendant's trains of cars while it was backing in the company's yards at Enid, assuming that he was then and there in the discharge of his duties under the contract, the question whether he was an independent contractor or simply an employee of defendant turns upon the contruction of the contract, and is a question of law for the court. *Chicago, R. I. & P. Ry. Co. v. Bennett*, 36 Okla. 358, 128 Pac. 705. This sends us to the contract. But before we examine the contract it is contended by counsel for plaintiff that the question of whether deceased was an independent contractor is *res adjudicata* because, he says, the United States court, in effect, held, in remanding the case to the state court, that such he was not, and, further, that he, at that time, was an employee of defendant engaged in an act of interstate commerce, and that such holdings are binding on this court. Plaintiff cites no authority in support of this proposition, and as we can find none and are of opinion that the only question decided by that court which is binding on this court is that it had no jurisdiction in this cause, we pass to the construction of the contract.

The contract is dated November 10, 1910, and therein deceased is called the "contractor." It obligates him, at his own cost, but for no specific time, to furnish all the labor necessary to handle all coal "required" by the company at Enid, from its cars to its coal chutes, and to pick up the coal dropped in so doing "and place same on cars and en-

gines "as desired" by the company; also, to break it into certain dimensions and "to unload all coal for stationary boilers;" also, to unload wood from cars to storage piles in its yards there and to load cinders from its right of way to cars "at points designated by" the company. It required him to be punctual in the discharge of his duties thereunder, and to keep a sufficient number of men to unload the coal without unnecessary delay or inconvenience to the company, and provides that the company shall not be liable for his death or injury while employed in the work. Also, that should he fail, neglect, or refuse faithfully to perform the contract, the company reserves the right to terminate the same at any time without being liable in damages and to be the sole judge as to whether the contractor is "faithfully and satisfactorily" performing the same. All tools to do the work were to be furnished by the company, and were to be returned by the contractor at its termination. It further provides:

"It is hereby agreed and understood that the contractor shall be deemed and held as the original contractor, and the railway company reserves and holds no control over him in doing such work other than as to the result to be accomplished."

Also, for the purpose of settling with the contractor, the contract provides that the company would keep a record of all coal delivered at the chutes for unloading, together with the number of tons in each car unloaded; that the contractor would make daily reports of the cars unloaded by him and "receive, collect, and deliver" to the authorized agent of the company "a ticket from each engineman, hostler, or other employee showing the number of tons of coal delivered to any engine." Closing, the contractor agrees not to sublet the work without the written consent of the company.

Aiding in the construction of this contract, the surrounding circumstances disclose that the yards referred to

are located at Enid, and, between the company's engine house on the south and Market street crossing them at an obtuse angle on the north, are 3,100 feet long north and south and about 325 feet wide east and west. Running out of the engine house northward are four tracks; the distance from the engine house to the coal chutes, northeast on the right of way, is about 200 feet; on the right of way are numerous tracks, some of which lead alongside this coal chute and thence northward past stockpens, some 500 feet on the west, and a freighthouse and platform some 400 feet long, about 900 feet from the stockpens on the east, and the passenger depot some 700 feet from the freighthouse on the same side of the tracks and near Market street on the north. The tracks east of the depot and freighthouse are nine in number, and include the main line, the passing track and yard track, and a water crane is located at the south end of the platform of the passenger depot, which is about 550 feet long. From all of which it seems that this is the yard or right of way referred to in the contract, and that the coal chute referred to in the contract is 100 feet long and contains 22 pockets; also that the cinders which deceased thereby contracted to load might be located anywhere upon this yard; that the storage piles of cordwood might also be so located, as might the sand cars to be unloaded, and that the engines to which he was required under the contract to supply coal might get it while alongside the coal chute or might receive it anywhere upon the numerous tracks in this extensive yard.

*Chicago, R. I. & P. Ry. Co. v. Bennett,* 36 Okla. 358, 128 Pac. 705, lays down the rules by which to construe this contract and determine from it whether deceased was an independent contractor, or a mere servant or employee of the company. That was a suit in damages by plaintiff against the company for negligently injuring him while in its employ as servant. One of the defenses was that, at

the time he was injured, he was an independent contractor. The facts were undisputed, and his contract with the company lay in parol. At the time he was injured he was employed by defendant to unload cars of coal into the tenders of defendant's engines as they lay alongside, and he was injured while so doing. His tools were furnished by the company. Defendant contended, we presume, for an application of the rule laid down in *Singer Manf. Co. v. Rahn,* 132 U. S. 518, 10 Sup. Ct. 175, 33 L. Ed. 440, where that court held that the relation of servant existed only where the employer retained the right to say "not only what should be done but how it should be done," and insisted, as plaintiff was paid by the ton and its station agent gave him no directions as to how he should unload the coal into the tenders, that he was an independent contractor. But in determining whether he was an independent contractor or not, the court, quoting approvingly from Thompson on Negligence, sec. 622, said:

"* * * In every case the decisive question is: Had the defendant the right to control, in the given particular, the conduct of the person doing the wrong? Does he reserve to himself the essential power of a master? It is but another form of language expressing the same idea to say that the true test to determine whether one who renders service to another does so as a contractor or not is to ascertain whether he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of his work and not as to the means by which it is accomplished. On this question the contract under which the work has been done must speak conclusively in each case, reference being had, of course, to surrounding circumstances."

And from 4 Words and Phrases, 3542:

"An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own method, and without being subject to the control of his employer except as to the result of his work. *Waters v. Pioneer Fuel Co.,* 52 Minn. 474, 55 N. W.

52, 38 Am. St. Rep. 564; *Indiana Iron Co. v. Gray*, 19 **Ind.**
App. 565, 48 N. E. 803, 807."

"But," said the learned commissioner in the opinion
in *Chicago, R. I. & P. Ry. Co. v. Bennett*, "the test is not
whether the defendant did in fact control and direct plain-
tiff in his work, but is whether it had the right under
the contract of employment, taking into account the circum-
stances and situation of the parties and the work, to so
control and direct him in the work. Moll on Independent
Contractors, 35; *Linnehan v. Rollins*, 137 Mass. 123, 50 Am.
Rep. 287. A case directly in point is that of *C. P. Hamil-
ton v. Oklahoma Trading Co.*, 33 Okla. 81, 124 Pac. 38, and
the numerous authorities cited and quoted from. See, also,
*Chas. T. Derr Const. Co. et al. v. Gelruth*, 29 Okla. 538, 120
Pac. 253."

He further cites Moll on Independent Contractors, at
page 76, where it is said:

"The ground upon which some decisions may be said to
have proceeded was that, in view of the humble industrial
status of the persons employed, and the simple character
of the work to be done, the only admissible inference was
that the employers intended to retain the right to give di-
rections in regard to the details of the work."

And at page 77:

"It was held in Massachusetts that the employer's in-
tention to retain the right of exercising control, and hence
creating the relation of master and servant, should always
be inferred when it appears that the employment was gen-
eral, and not based on a contract to do a certain piece of
work on certain specified terms in a particular manner and
for a stipulated price."

And, governed by these rules, it was held that the
plaintiff in that case was not an independent contractor,
but an employee of the company. If in that case plaintiff
was held to be nothing more than a mere servant or em-
ployee, we cannot see how we can hold that he was other
than that in this case. Considering the contract in whole

and construing it in the light of surrounding circumstances: Here is deceased, who was given a shovel by the company and put to work unloading cars of coal into a chute, placed there by the company, with directions also to unload sand from its cars at a point on its right of way to be designated by the company when occasion should arise. He was also required, under his contract, to load cinders, at points to be designated by the company, from its right of way into its cars; also, to unload cordwood where designated on storage piles along its right of way. Clearly, in order to know what cars to unload, he would have to be told by the company and, when told, the company would so far superintend his work and control his actions. And this, too, under the stipulation contained in the contract that he was liable to be discharged at any time, or the contract terminated, which is practically the same thing, at the pleasure of the company. We can see nothing more in the contract than that the deceased was a common laborer, an employee of and under the control and supervision of the company, and subject to discharge at the pleasure of the company.

It takes very little for courts to hold that one is subject to the control of another, and hence a servant and not an independent contractor, under the arrangements existing between them. In *Johnson v. Hastie*, U. P. Q. B. 232, one M. agreed to burn and clear off the timber on defendant's fallow at a certain price per acre. While doing so defendant, who lived a short distance away, came occasionally to see how the work was progressing, and on one occasion advised him to set fire to the log heaps. M. told him that a certain brush fence might take fire, but defendant said it would make no difference. M. then fired the heaps and went home, during which time the fire spread and burned plaintiff's fences. It was held, upon this evidence, that M. was not an independent contractor over whom defendant had no control, but was his servant or employee. It seems

the case turned upon the act of control stated, and defendant was held guilty of an act of negligence. In view of all of which, we say that, as the contract in question obligated deceased to furnish all labor "required" to handle all coal "furnished" by the company at Enid and to unload its cars in its coal chutes "and place on cars or engines as desired" by the company, and "to unload all coal for stationary boilers" located no telling where on the company's right of way, and to unload wood from its cars on storage piles in its yards there, and to load cinders from its right of way to cars "at points designated by the company," a fair construction of the contract is that the company had the right, under the contract, to control and direct him in the work, and that he was an employee of the company, and not an independent contractor.

Besides, the contract characterizes him as an employee by reason of the fact that the intent of the contract is to reserve the right in the company to discharge him at its pleasure. Some of the cases hold that this in itself is sufficient to hold him to be an employee under the contract.

In *Southern Cotton Oil Co. v. Wallace,* 23 Tex. Civ. App. 12, 54 S. W. 638, D. was engaged by an oil company to bale cotton seed hulls with its machinery at so much per bale. It exercised control over the manner in which he did the work. It had the right to discharge him at any time. It was there held that D. was an employee of the company.

In *Steger v. Barrett* (Tex. Civ. App.) 124 S. W. 174, the fifth paragraph of the syllabus reads:

"Where the operator of a corn sheller employed the owner of a traction engine to assist in shelling corn and to furnish power for the work at a specific sum per day for the use of the engines and for his services, the owner being subject to the orders of the operator and liable to be discharged at any time, the owner was not an 'independent contractor,' but was a servant of the operator, for whose acts the operator was liable."

See, also, *Western Union Tel. Co. v. Parsley* (Tex. Civ. App.) 114 S. W. 156; *Bernauer & Ruh v. Hartman Steel Co.,* 33 Ill. App. 491; *Holmes, Jr., v. Tennessee Coal, etc., Co.,* 49 La. Ann. 1465, 22 South. 403; *Burke, Respondent, v. City & County Contract Co., Appellant, Impleaded with N. Y., W. & B. Ry. Co., Defendants,* 133 App. Div. 113, 117 N. Y. Supp. 400; and the valuable and exhaustive note to *Messmer v. Bell, etc., Co.* 19 Ann. Cas. 1.

Not only did the contract reserve to the company the right to control and direct deceased in his work, but it might be well to know, although we are only passing on the face of the contract, that the company, pursuant to the power therein reserved, did that very thing which confirms us in our opinion, gathered from the fact of the contract, that the same was not capable of execution without such direction and control. Such amounts to a practical construction of the contract by the company. Mr. Bowman, station agent and yardmaster of defendant, testified:

"Q. From whom did Turner get instructions about handling the work performed by him? A. Under his contract, from us. Q. You directed him what to do? A. Yes, either me or my chief clerk. Q. So that he was under your supervision and control all the time? A. In so far as his contracts were concerned, yes, sir. Q. He performed his duties in accordance with what you directed him to do? A. Yes, sir. Q. I will ask you if all this coal he handled for the chutes, if that was Rock Island Coal? A. Yes, sir."

We are, therefore, of opinion that, at the time he was injured, deceased was not an independent contractor, but an employee of the company, and plaintiff is entitled to recover under the Federal Employer's Liability Act—that is, if, at the time, deceased was "engaged in interstate commerce" within the contemplation of the act.

The act relied upon is entitled "An act relating to the liability of common carriers by railroads to their employees in certain cases." That part pertinent to our inquiry provides:

"Sec. 1. That every common carrier by railroad while engaging in commerce between any of the several state * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

It is conceded that defendant, at the time deceased was injured, was engaged in interstate commerce, and that the men in charge of the train while backing were, at that time, employees of the company; but it is contended that as there was no evidence reasonably tending to show that deceased was at that time engaged in interstate commerce, he was not entitled to the protection of the act, and the court should have directed a verdict for defendant upon this ground. On this point the evidence fairly discloses that it was the duty of deceased to order coal for the chutes, and when the cars were placed alongside, to unload the coal into the chutes and from there into the tenders of defendant's engines engaged in both intrastate and interstate commerce. It was also his duty to make daily reports of the cars unloaded by him, and receive and deliver to a representative of the company a ticket from each engineman or other employee of the company showing the number of tons of coal delivered to any engine operated by the company. These tickets, when received by him, were kept in two boxes at the coal chutes, and each day between 4 and 6 o'clock in the afternoon, were turned in by him to Mr. Wallace, chief clerk of the company at the freighthouse. He also had a contract with the Enid Mill & Elevator Company, whose place of business abutted on the company's right of way some 700 feet diagonally across the tracks and to the northeast, and perhaps others, to unload coal from the company's cars consigned

to them, for which no tickets passed. The evidence also discloses that on the day he was injured tickets had thus accumulated in the boxes at the coal chutes and two such tickets were thereafter found by Mr. Wallace in the north box; that about 4 o'clock that afternoon Conway, who was assisting deceased in unloading a car of coal at the chutes, left there and went to deceased, who was assisting in loading a car of coal for said elevator company on the yards near its plant, and informed him that he was through unloading, whereupon deceased started back towards the chutes and disappeared among the cars standing upon the tracks; that he was next seen about 5 o'clock, at which time he was in the plant of said company and wanted to hire help to load said car; that he remained there perhaps 20 minutes and left going in a southerly direction down the tracks; that shortly thereafter he was seen by Henderson, the fireman of that concern, coming from that direction as he was standing on a pile of cinders at the south end of the plant; that when deceased joined him there, witness, who was engaged in hauling cinders from the boiler room, testified:

"A. Well, he walked up to me and spoke, and asked me if I thought I would have coal enough to run me until Monday night. I said I didn't think I would, and he then pulled a match from his pocket and lit his pipe; about that time we heard the train whistle; he looked at his watch and said, 'there is 24. I must go to the freight depot and take my coal tickets and order coal for the chutes,' then he turned around and walked off toward the freight depot."

The evidence further discloses that in making his way to the freighthouse deceased went south from where they were talking, along and between the strings of cars standing on the tracks, until he reached a point south of the north end of the freighthouse, where he turned and rounded the end of the string to his right, and, after perhaps crossing a track or two, walked northward between the tracks in order to get around the north end of another string between

him and the freighthouse; and that while so doing, and when he was at a point east of the north end of the freighthouse, an engine and two box cars and a flat car, backing on the track to his left in the direction in which he was going and running at about 25 miles per hour, and in excess of the speed prescribed by the city ordinance, ran over and killed him as he turned, without knowledge of its presence until too late, and attempted to cross the track in front of it.

All of which reasonably tends to prove that the deceased was engaged in interstate commerce at the time he was killed. This for the reason that his contract required him to furnish the labor that coaled the engines and made the steam that created the power that sped the trains carrying both intrastate and interstate commerce on its way, and that the turning in of the tickets to Wallace at the freighthouse was, in a manner, making his report to the company of what he had done, which was incident to his contract and within the scope of his employment. In other words, we are of opinion, it being conceded that defendant was engaged in interstate commerce at the time, that so was deceased, for the reason that at that time he was engaged in his master's business and was furnishing or in the act of attempting to furnish something to contribute thereto.

In *Darr v. Baltimore & Ohio Ry. Co.,* (D. C.) 197 Fed. 665, plaintiff was employed by defendant and was injured while in its service. He brought suit under the Employers' Liability Act and recovered a verdict. The defense was, as here, that he was not entitled to the benefits of the act in question because he was not engaged in interstate commerce when injured. The facts were that on the morning of the accident and shortly before it occurred, one of defendant's trains had been brought in from Brunswick, Md. through West Virginia to Cumberland, Md. Later in the day the train was taken back over the same route. Upon

its arrival at Cumberland, the train was on what was called the "fire track." A bolt had fallen out of the brake shoe on one of the wheels of the tender, as a result of which the brake beam hung down in dangerous proximity to the rail, and plaintiff was directed to make the necessary repairs while the tender was on the "fire track." While so doing he was injured as a result of the negligence of a fellow employee who had, contrary to directions of plaintiff and unknown to him, put the air on the brake. Under this state of facts it was held that, as defendant was engaged in interstate commerce, plaintiff was engaged therein at the time he was injured within the meaning of the act and could maintain his suit. In that case if plaintiff, while replacing a bolt, was engaged in interstate commerce, he would probably have been so held to have been engaged had be been run over by defendant's train while on his way to replace it with the bolt in his hand; on the strength of which we hold that deceased was engaged in interstate commerce while making his way to the freighthouse with these tickets in his hand. We say he had these tickets in his hand at the time he was killed, for the reason that the evidence reasonably tends to prove that fact, although they were never found, so far as the record discloses. Had they ever been found after the injury under circumstances showing that he did not have them at the time, defendant would not have been slow to disclose that fact. Their absence can be accounted for and the jury might have fairly inferred from the evidence that after he left Conway at 4 o'clock to go to the coal chutes he got them and had them in his possession when at 5 o'clock he said to Hutchinson that he must go and turn them in and started for the freight house, and that they were blown away by force of the high wind prevailing at that time or were otherwise lost in the excitement of the casualty.

We said that the taking of these tickets by deceased to the agent of defendant at the freighthouse was incident to his contract with the company and within the scope of his employment., When such is the case and the employee is injured while engaged in the execution of a duty thus incident, he is entitled to the protection of the act. In *Carr v. N. Y. C. & H. R. R. Co.*, 77 Misc. Rep. 346, 136 N. Y. Supp. 501, plaintiff was a brakeman in defendant's employ as one of a crew on what was known as "pick up train No. 181," running between points in the state of New York. When the train reached Tonawanda there was in the train a number of cars loaded with freight destined and consigned to points outside the state, and the train was engaged in both intrastate and interstate commerce. In the train was a car billed to North Tonawanda and another loaded with freight billed to another point in the state. Both of these cars were loaded and shipped from a third point in the state. Orders were given to the train crew to cut out these two cars at North Tonawanda and place them on the siding there. In cutting them out the plaintiff was directed to climb on top of one of them and set the hand brakes so they would not move after being placed on the siding. Owing to the fact that while so doing a fellow brakeman was negligent in uncoupling the compressed air hose, the wheel used by plaintiff in setting the brake was caused to revolve rapidly in the opposite direction from those on cars in common use, and the sudden reverse motion to operate so as to throw him from the car and injure him. It was held that he was engaged in interstate commerce within the contemplation of the act, and was entitled to maintain his suit, and that his work at the siding was merely incident to the operation of the train in interstate commerce.

In *Illinois Central R. R. Co. v. Behrens, Adm., etc.*, 223 U. S. 473, 34 Sup. St. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163, quoting approvingly from *Pederson v. Delaware, L. &*

*W. R. Co.*, 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153, the court, speaking to the act, said:

" 'There can be no doubt that a right of recovery thereunder arises only where the injury is suffered while the carrier is engaged in interstate commerce and while the employee is employed by the carrier in such commerce.' * * * 'The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?' * * *"

In *North Carolina R. Co. v. Zachary*, 232 U. S. 248, 34 Sup. Ct. 305, 58 L. Ed. 591, Ann. Cas. 1914C, 159, the case turned upon whether the evidence reasonably tended to show that deceased was engaged in interstate commerce at the time he was killed. The court held that it did. The evidence disclosed that train 72 of the Southern Railroad Company had come into Selma, N. C., from a point in Virginia and other points, and that a "shifting crew" was "working" the train so as to take two cars from it and put them into a train that was to include these two cars and other cars to be hauled from Selma to a point in North Carolina by engine No. 862, upon which deceased was employed as fireman for the trip to begin, he having already prepared his engine for the trip. After inspecting, oiling, firing, and otherwise preparing his engine for the trip, he left it and started across the tracks in the yard in the direction of his boarding house and was run over and killed by another train as a result of the negligence of his fellow employees. The court said:

"It is argued that because, so far as appears, deceased had not previously participated in any movement of interstate freight, and the through cars had not as yet been attached to his engine, his employment in interstate commerce was still in future. It seems to us, however, that his acts in inspecting, oiling, firing, and preparing his engine for the trip to Selma were acts performed as a part of interstate commerce, and the circumstances that the interstate freight cars had not as yet been coupled up is legally insignificant. See *Pederson v. Delaware, L. & W. R. Co.*,

229 U. S. 146, 151, 33 Sup. Ct. 648, 57 L. Ed. 1125, 1127 [Ann. Cas. 1914C, 153]; *St. Louis, S. F. & T. Ry. Co. v. Seale*, 229 U. S. 156, 161, 33 Sup. Ct. 651, 57 L. Ed. 1129, 1134 [Ann. Cas. 1914C, 156].

"Again, it is said that because deceased had left his engine and was going to his boarding house, he was engaged upon a personal errand and not upon the carrier's business. Assuming (what is not clear) that the evidence fairly tended to indicate the boarding house as his destination, it nevertheless also appears that deceased was shortly to depart upon his run, having just prepared his engine for the purpose, and that he had not gone beyond the limits of the railroad yards when he was struck. There is nothing to indicate that this brief visit to the boarding house was at all out of the ordinary, or was inconsistent with his duty to his employer. It seems to us  *  *  *  that the man was still 'on duty,' and employed in commerce, notwithstanding his temporary absence from the locomotive engine. See *Missouri, K. & T. R. Co. v. United States*, 231 U. S. 112, 119, 34 Sup. Ct. 26 [58 L. Ed. 144]."

"We conclude that with respect to the facts necessary to bring the case within the Federal Act, there was evidence that at least was sufficient to go to the jury.  *  *  *"

In *St. Louis, S. F. & T. Ry. Co. v. Seale*, 229 U. C. 156, 33 Sup. Ct. 651, 57 L. Ed. 1129, Ann. Cas. 1914C, 156, the facts were that defendant was a Texas corporation owning and operating a railroad which extended from the Oklahoma line southward through North Sherman and other points in Texas and connected with the Oklahoma line which extended northward from North Sherman into Oklahoma through Madill. Deceased was employed by defendant as yard clerk in its yards at North Sherman. His principal duties were to examine incoming and outgoing trains and make a record of the number and initials on the cars, to inspect and make a record of the seals on the car doors, to check the cars by the conductor's lists, and put cards on or labels on the cars to guide the switch crews in breaking up incoming trains and making up outgoing trains. His duties related both to intrastate and interstate commerce,

and at the time he was killed he was in the discharge of his duties and was on his way through the yards to one of the tracks therein to meet an incoming train from Madill. While so doing he was struck and fatally injured by a switch engine negligently operated by the employees in the yard. After stating the question involved to be whether the federal statute was applicable and whether the injury complained of was sustained while the company was engaged, and while deceased was employed by it, in interstate commerce, the court said:

"In our opinion the evidence does not admit of any other view than that the case made by it was within the federal statute. The train from Oklahoma was not only an interstate train, but was engaged in the movement of interstate freight, and the duty which the deceased was performing was connected with that movement not indirectly or remotely, but directly and immediately. The interstate transportation was not ended merely because that yard was a terminal for that train, nor even if the cars were not going to points beyond. Whether they were going further or were to stop at that station, it still was necessary that the train be broken up and the cars taken to the appropriate tracks for making up outgoing trains or for unloading or delivering freight, and this was as much a part of the interstate transportation as was the movement across the state line. *McNeill v. Southern Railway Co.*, 202 U. S. 543, 559 [26 Sup. Ct. 722, 50 L. Ed. 1142]. See, also, *Johnson v. Southern Pacific Company*, 196 U. S. 21 [25 Sup. Ct. 158, 49 L. Ed. 363]."

From which we learn that, as the duties deceased was discharging there and here at the time he was killed related to both intrastate and interstate commerce, it was not incumbent on the plaintiff there or here to disassociate by proof the one from the other, but that he was entitled to have the jury say whether at that time deceased was employed in interstate commerce; and that it will not do to say that, inasmuch as it is impossible to say whether deceased had in his hands tickets for coal supplied to engines engaged

in interstate commerce or tickets for coal used by engines engaged in intrastate commerce, there is no evidence reasonably tending to prove that he was engaged in interstate commerce at the time he was killed. This for the reason that the cases cited support the view that, as the evidence fairly disclosed that the tickets were for coal supplied to engines engaged in both intrastate and interstate commerce, it might be fairly inferred that deceased was engaged in an act of both intrastate and interstate commerce at the time he was killed, and hence came within the protection of the act, or that the evidence was at least sufficient to take the question to the jury of whether he was or not. Besides, in the conversation with Hutchinson before he started, he said that he must go to the freighthouse and take the tickets and order coal for the chutes. This was sufficient to characterize his act in going as one pertaining to interstate commerce, for the reason that the coal he was talking about was for the use of defendant's engines engaged in both intrastate and interstate commerce, and not for the exclusive use of either.

We are, therefore, of opinion that the evidence reasonably tends to prove that the deceased was engaged in interstate commerce at the time he was killed and the court did right to overrule the motion to direct a verdict for defendant—that is, if the evidence was sufficient to take the case to the jury on the question of defendant's negligence.

On this point, in addition to what has been said, the evidence reasonably tends to prove that as deceased was walking north between the tracks, track No. 3 was on his right and track No. 2, track No. 1, the passing track, the main track and the house track were on his left, all 13 feet apart; that while walking thus, passenger train 24, to which he had referred in his conversation with Hutchinson, passed him going south on the main track and stopped at the passenger depot just beyond him; that back from the same di-

rection on track No. 2 came backing freight No. 2113, consisting of an engine and tender and two box cars and a flat car at a speed of something like 25 miles per hour, in violation of the city ordinance. It is fair to presume that his attention was attracted by the train which had just passed and that he was unaware of the approach of this freight, which was in charge of an engineer, fireman, and two brakemen, the brakemen upon the end of the car nearest the deceased and one of them seated facing the north on the northwest corner of the flat car. Although plaintiff in his petition bases his right to recover on some 20 specific grounds of negligence, including the allegation that defendant, at the time of the accident, had violated the Federal Safety Appliance Act, *supra,* in failing to use the continuous train power brake, with which the engine and cars inflicting the injury were equipped, the court, in effect, peremptorily instructed the jury that plaintiff could not recover on any of them except that ground and the further alleged ground of defendant's failure to exercise reasonable care to stop the train after the peril of deceased was discovered by those in charge. Of course, if there was no evidence reasonably tending to prove that, after the perilous position of deceased was discovered, the train could have been stopped by defendant in the exercise of ordinary care and the injury averted, had it not been running in excess of the speed of ten miles an hour as prescribed by the ordinance, the court erred in sending the issue to the jury. On this point the evidence further discloses that, being unaware of the close proximity of this backing freight, deceased, deflecting his course to the northwest, stepped upon the track within some 75 feet of it, and, continuing diagonally between the rails, was in the act of placing his left foot outside the west rail when he was struck by the train and killed. Now here is a defendant, running at an unlawful speed, in a city yard of nine tracks, where from around or through the strings of parallel cars in close proximity on

each side a man might step upon the track in front of it at any moment, backing its cars over a man rightfully on the premises and unconscious of danger, and contending that such was not negligence, and if it was, the same was not the proximate cause of the injury. In thus contending, defendant might be likened to a man throwing a missile along a crowded thoroughfare and insisting, after a pedestrian, unconscious of the throw, had turned into it and been injured, that no negligence could be attributed to the thrower and that the negligence of the person struck was the proximate cause of his own misfortune. It is sufficient to say concerning this assignment that, as there was evidence reasonably tending to prove that the engineer knew or ought to have known when he first saw deceased deflecting towards the tracks in front of him, that he would be upon the track when the train reached him, and could have avoided injuring deceased by the exercise of proper care, had the train been running at a lawful speed, and hence his failure to do so was the proximate cause of the injury, the court did right to send the issue to the jury.

A similar situation existed in *St. Louis & S. F. R. Co. v. Kral*, 31 Okla. 624, 122 Pac. 177, except that the train was not running at improper speed. There the railroad and dirt road converged at an angle of about 45 degrees. Before the train had reached the point Kral was seen driving his team and converging on the track at that point, and both the train and Kral continued to converge and collided on the crossing. Kral invoked the doctrine of the last clear chance. The company contended, as here, that there was no evidence reasonably tending to prove that the negligence of the company was the proximate cause of the injury. We said:

"At the time plaintiff was first seen by the engineer, if he knew or ought to have known that the plaintiff would be upon the crossing when the treain reached it, and could have avoided the collision, his failure so to do was the proxi-

mate cause of the injury, and plaintiff is entitled to recover, otherwise not. And if, in applying this rule to the evidence, reasonable men might differ, the question is one of fact for the jury."

And so we say here. At least there was evidence reasonably tending to prove that after seeing him in peril those in charge could have stopped the train and avoided the injury, had the train been running within the speed prescribed by the ordinance.

Although the court in the eleventh instruction may not have correctly defined negligence, the court did correctly define what defendant's duties were in connection with the doctrine of the last clear chance, which was all defendant was entitled to. The court said:

"The court instructs the jury that if they find and believe from the evidence that immediately prior to receiving the injury which caused his death, the deceased, William L. Turner, was walking between tracks 2 and 3, in the switch yard at Enid, and that while without looking or listening for an approaching train he stepped from a position of safety to one of peril and was killed, then your verdict must be for defendant, unless you further find that after he reached a position of peril, and such peril was discovered by the employees of the railroad company, such employees failed to use the care and caution that prudent persons would use under the same circumstances to avert the injury."

We say all defendant was entitled to; it was more than it was entitled to, under the rule laid down in the Kral case *supra.* And besides, as the element of unlawful speed of the train was omitted from the charge, it was a wonder plaintiff recovered at all.

Neither can we say that there was no evidence reasonably tending to prove that the engineer failed, while running the train in question, to use and operate the continuous train brake with which the same was equipped. This for the reason the engineer received the signal while deceased

was on the track 40 feet away, and, according to the test made by the company, could have stopped his train by a proper application of the brakes within 120 feet. As it was, the evidence reasonably tends to prove that he did not stop short of a distance of 360 feet. Hence instructions Nos. 10, 16, and 18, which left the question of 'whether he did or not to the jury, were proper. Nor is there merit in the contention that the court erred in withdrawing instruction No. 39 after it had been given, which in effect told the jury that plaintiff could not recover on that ground.

It is sufficient to say of the instructions as a whole that, except as noted, they fairly state the law, and for that reason and that we find no error in the record, the judgment of the trial court is affirmed.

All the Justices concur, except BROWN, J., not announcing.