**TEXACO, INC., a Foreign Corporation, Plaintiff in Error,**

v.

**Daniel J. LAYTON, Jr., Administrator of the Estate of Jimmy Alexander, Deceased, Defendant in Error.**

No. 40212.

Supreme Court of Oklahoma.

March 3, 1964.

Rehearing Denied Sept. 15, 1964.

Hudson, Hudson, Wheaton, Kyle & Brett, Tulsa, for plaintiff in error.

Arthurs, Blackstock & McMillan, Bristow, George Sam Caporal, Oklahoma City, for defendant in error.

JACKSON, Justice.

In the trial court this wrongful death action was brought by plaintiff Daniel Layton, Jr., as administrator of the estate of Jimmy Alexander, who, with two others, was burned to death in a fire in a filling station in Oklahoma City. Plaintiff did not sue the operator of the filling station, but elected to prosecute his action against Texaco, Inc., only.

There is no dispute as to the events surrounding the fire. The operator of the station was Bob Anderson, who leased it from Texaco, Inc., the defendant in the trial court. Anderson also had a "Gasoline Consignment Agreement" with Texaco. On the night of the fire, Anderson was not at the filling station, but had left it in charge of Clarence Little, his employee. A truck driver and regular customer named Mauldin drove into the station for some gasoline, and told Little that he must first have some water cleaned out of his "saddle tank". He then drove the truck into the wash room for that purpose. Jimmy Alexander, plaintiff's decedent, had driven into the station with his father for some gasoline, and they entered the wash room to wait while the work on Mauldin's gas tank was being done. In the wash room were two gas appliances with pilot lights, a hot water heater and an overhead "space heater". Little opened the drain plug on the gas tank and drained the gas into two open containers which he set to one side. He "blew out the lines" with a compressed air hose and then applied the compressed air hose to the tank itself. At this time there was an explosion and fire which caused the deaths of Jimmy Alexander, his father, and Clarence Little.

Verdict and judgment were for plaintiff and against Texaco, and Texaco appeals.

The argument on appeal chiefly concerns the contractual relationship between Texaco and Anderson. In general, Texaco argues that the relationship was that of bailor and bailee, or principal and commission factor; and that the doctrine of respondeat superior does not arise from the existence of such relationships merely, but arises only where, in addition to the contractual relationship, it is shown that the superior (or principal, or bailor) had the right to control, or actually did control, the subordinate (or bailee, or commission factor) in the manner of the doing of the thing which resulted in the injury.

Plaintiff agrees generally with this statement of the law, but argues that the right to control is to be found in the contracts themselves, and that "The record in this case is replete with instances of actual control exercised by Texaco over the physical movements of Anderson and the other employees at this Texaco station".

In argument on this point, both parties have cited many cases concerning the distinctions between a servant and an independent contractor, such as Keith v. Mid Continent Petroleum Corp., Okl., 272 P.2d 371; Chicago, R. I. and P. Railway Co. v. Bennett, 36 Okl. 358, 128 P. 705, 20 A.L.R. 678; and Chicago, R. I. and P. Railway Co. v. Bond, 47 Okl. 161, 148 P. 103. Many of the cases cited, including all of those listed above, do not involve the doctrine of respondeat superior, and are therefore not precisely in point, for reasons to be hereinafter noted.

Both parties concede that defendant Texaco is liable in this case, if at all, under

the doctrine of respondeat superior. It is said in 77 C.J.S. Respondeat Superior, beginning at page 318, that

"The phrase is used to indicate the responsibility of a principal for the acts of his servant or agent. * * *

* * * * * *

" * * * *It involves solely the rights of third persons,* and applies only where the relationship of master and servant or of principal and agent is shown to exist, or, *more specifically,* only when the relationship of master and servant, employer and employee, or principal and agent is shown to exist between the wrongdoer and the person sought to be charged for the result of the wrong at the time and *in respect to the very transaction out of which the injury arose.* The doctrine implies that the person sought to be charged must stand in the relation of superior to the wrongdoer, and is founded on the right to direct and supervise. * * * (Emphasis supplied.)

While we agree that in general the above is a correct statement of the law, it is subject to discriminating analysis. It should be noted that the master-servant, employer-employee, or principal-agent relationship must exist with regard to "the very transaction out of which the injury arose", and, we may add, it need exist *only* with regard to such "transaction". For this reason, cases involving claims of servants against masters for damages for personal injuries, in which the usual defense that plaintiff was not a servant but an independent contractor, is made, are of doubtful assistance. In such cases, the courts generally have used six or seven "factors" in determining whether plaintiff was a servant or an independent contractor, several of which may be immaterial in a respondeat superior case. See Ellis and Lewis, Inc. v. Trimble, 177 Okl. 5, 57 P.2d 244; Keith v. Mid-Continent Petroleum Corporation, supra. Also, in such cases, the negligence of the master, or superior, is his *actual* negligence, such as a failure to provide a safe place in which to work, or a failure to provide safe tools and appliances. In respondeat superior cases, the actual negligence is that of the subordinate, and the negligence of the master or superior is derivative only.

Winkelstein et al. v. Solitare, 129 N.J.L. 38, 27 A.2d 868, is particularly enlightening in this connection. The agreed facts in that case were that defendant Solitare went to the home of a friend to pick up his wife and take her home. He offered a ride to other guests who were present. He was in the driver's seat of the automobile; his wife got in beside him; and his sister-in-law, Ann Solitare, was to his wife's right. Defendant said "Ann, it is cold in here; close the door." The sister-in-law thereupon closed the door of the car upon the finger of the female plaintiff, who had grasped the door frame for support while entering the back seat of the car.

Defendant's motion for directed verdict upon the ground that "the negligence of Ann, the sister-in-law, was the act of an independent third party and not the act of the defendant's agent, servant or employee, so that if she were guilty of negligence, that negligence could not be imputed or attributed to the defendant as the master or principal" was sustained. The Supreme Court of New Jersey reversed the judgment and granted a new trial, saying:

" * * * The closing of the door was at defendant's express direction, and in his presence; and thus the wrongful act in the execution of the command was his own. * * *

" * * * The actor was the agent or servant of defendant so as to render him liable for her wrongful act in the performance of the service thus undertaken at his request. The relationship of master and servant *in its full sense* arises only out of contract, express or implied; but to constitute that relation *as to third persons,* it is not requisite that 'any actual contract should subsist between the parties, or that compensation should be expected by the servant. * * * 'The real test

as to third persons,' says Mr. Wood, in his work on Master and Servant, p. 11, § 7, 'is whether the act is done by one for another, however trivial, with the knowledge of the person sought to be charged as master, or with his assent, express or implied, even though there was no request on his part to the other to do the act in question.' Doran v. Thomsen, 76 N.J.L. 754, 71 A. 296, 19 L.R.A.,N.S., 335, 131 Am.St. Rep. 677. * * *" (Emphasis supplied.)

■ The points illustrated by the New Jersey case are (1) it is not necessary, in respondeat superior cases, to show the existence of a master-servant, or "superior-subordinate", relationship "in its full sense"; and (2) it *is* necessary to show such a relationship in respect to the transaction out of which the injury arose.

■ It also illustrates the fact that the doctrine of respondeat superior is not limited to instances in which the superior has the *right* to control the transaction out of which the injury arose, but extends also to instances in which the superior *actually exercises control,* regardless of any inherent or contractual right to do so. In the instant case, defendant concedes in his brief that under the instructions of the trial court, and the case of Chicago, R. I. and P. Railway Co. v. Bennett, 36 Okl. 358, 128 P. 705, 20 A.L.R. 678, supra, the *right* to control must be found within the terms of the contractual agreements between the parties before the doctrine of respondeat superior can be applied. However, as above noted, the doctrine of respondeat superior was not involved in that case, which was an action against the railway company for damages for personal injuries received by an employee in the course of his employment.

■ In summary, it may be said that the basic inquiry in any respondeat superior case in which the specific act of negligence by the subordinate is admitted (as it is in this case) is whether the superior had the right to control, or actually did control in some measure, the actions of the subordinate in respect to the transaction out of which the injury arose.

With that principle in mind, we now examine the record before us to see if the doctrine of respondeat superior is applicable in this case. We agree at the outset that plaintiff has pointed out many instances in which, under the two written contracts between Texaco and Anderson, Texaco retains the right to a substantial degree of control over Anderson. These "controls" concern such things as the retail price of gasoline to be collected by Anderson; the keeping and examination of records and taking of inventories; the prohibition of the sale of other brands under the Texaco trademark; the amount of Anderson's commission; the term of the lease and the related gasoline consignment agreement; and Anderson's credit policy. Without setting out in further detail the contents of the two instruments, it is sufficient to say that we do not find in either of them a "right" on the part of Texaco to control Anderson in the transaction out of which the injury arose. The remaining inquiry is whether, aside from the rights of Texaco under its contracts with Anderson, it actually did through Anderson control Little, in some measure, in the act which he admittedly performed negligently.

In this connection, there was evidence that Texaco inspectors visited the Anderson station about twice each month. On these visits they filled out inspection report forms entitled "Texaco Dealer's Registered Rest Room—Sparkle Report" and "Service Station Inspection Report". Anderson testified that on some occasions the inspectors would give him a copy of the report and at other times they did not. The sparkle report is apparently prepared in triplicate for the information of the Zone Manager, the State Manager, and the Division Office.

On an inspection report dated July 13, 1959, the Inspector noted the following:

"Old tires need to be removed from north front and back—Grass needs cutting. Entire station needs to be swept.

"Approaches—Need to have dirt washed or swept away.

"Driveway—No grease, but needs sweeping.

"Curbs—Need Painting.

"Pumps—Need to be cleaned.

"Service Area—Entire area needs cleaning.

"Lawn Area—Needs mowing.

"Soft Drink Dispensers—Need to be wiped off.

"Housekeeping—Floor dirty and bowls need to be cleaned.

"Salesroom—Whole room needs sweeping, shelves and desks need dusting.

"Windows—Windows in lube bay need to be cleaned.

"Bays General Appearance.—Lube bay looks good. Wash bay looks bad. Bob said he will re-paint wash bay this week.

"Lifts—Lift in lube bay is good. Lift in wash bay need cleaned & paint.

"Work bench—Cluttered.

"Tire racks—Tires need to be painted and stacked.

"Storeroom—Cluttered.

"Compresser—needs to be cleaned.

"Heater—Dirty.

#### "Personnel

"General Attitude—All personnel seem happy with job. All are paid bonuses on TBH sales.

"Uniforms—All personnel are in correct uniforms.

"Service (observed)—All personnel give good service."

Ratings on the above items were given as excellent, good, fair, or poor.

There was testimony from former employees that the station was inspected for cleanliness "and to see if it was run right"; that the inspectors talked to Mr. Anderson and "told him how they wanted it run"; that they would "tell us what we were doing wrong"; that the inspectors were present when gasoline in open containers was being used in the washroom and grease room, and must have seen it; that on several occasions the inspectors spent some time in the role of filling station attendant, showing them "how to perform" their work; that they were never instructed not to drain gas tanks in the wash room. Most of former employees' testimony was denied by the inspectors.

Inspectors testified that their activities were for purely instructional and advisory purposes, and that their recommendations and suggestions were not binding upon Mr. Anderson; that he on occasion did not follow their suggestions; and that their purpose was merely to increase Anderson's volume of business, and his profits. They agreed that in increasing Anderson's profits, they also increased to profits the Texaco.

Anderson testified that the filling station attendants were his employees and not Texaco's; that he prescribed their working hours and wages, and that they took their instructions from him. He also testified that Texaco furnished him with no written set of rules and regulations to follow.

■ In Ottinger v. Morris, 187 Okl. 517, 104 P.2d 254, we held:

"Where a contract is in writing, ordinarily the question of whether the relation of employer and independent contractor is created is one of law for the court. But a contract which, upon its face, creates the relation of employer and independent contractor will not protect the employer if from facts and circumstances appearing in the evidence it may be reasonably inferred that notwithstanding the contract the real relation was that of master and servant."

As heretofore noted there is testimony in this case to the effect that the inspections were made to "see if it (the station) was run right", and inspectors told Mr. Anderson "how they wanted it run", and would tell us "what we were doing wrong". In view of all the facts and circumstances ap-

pearing from the record, and the ease with which Texaco was authorized to cancel their consignment agreement upon five days notice, without cause if it so elected, we are unable to determine as a matter of law the extent of the control which Texaco exercised upon Anderson and his employees in the operation of the station.

 The question of whether Texaco actually exercised control over Anderson and his employee in the activities which resulted in the injuries complained of was not submitted to the jury.

Summarized very briefly, the court's instructions in this connection were in effect that *under the lease,* Anderson was an independent contractor or tenant, and that Texaco would not be responsible for his negligence in the general operation of the filling station business; but that *under the gasoline consignment agreement,* Anderson was Texaco's agent *for the purpose of the sale of gasoline only,* and that Texaco would be liable for the negligence of Anderson and/or his employees within the scope or the employment or agency. Insofar as the questions involved in this appeal are concerned, the precise question of fact submitted to the jury was whether Little's activities at the time of the explosion and fire were in connection with his employment by Anderson in the general operation of the filling station business, or in connection with his employment by Anderson in the carrying out of Anderson's duties as Texaco's agent.

As we have seen, *insofar as the applicability of the doctrine of respondeat superior under the particular facts in this case is concerned,* the written contracts between the parties did not justify a peremptory instruction by the court that Anderson was Texaco's agent for the purpose of the sale of gasoline only, since the contracts do not show on their face that Texaco retained the *right* to control Anderson or his employees in respect to the transaction out of which the injury arose.

Since the evidence with respect to whether Texaco *actually exercised control* in that respect is in conflict, it created at the most a question of fact for the jury, and not a question of law for the court, on this point. It is reversible error for the court, in its instructions, to invade the province of the jury, assume a controverted fact as proved or treat it as a question of law, and withhold the same from the determination of the jury. Swift v. McMurry, 133 Okl. 104, 271 P. 635.

The judgment is reversed and the cause is remanded to the trial court with instructions to grant defendant Texaco a new trial.

HALLEY, V. C. J., and DAVISON, JOHNSON, WILLIAMS, IRWIN and BERRY, JJ., concur.

BLACKBIRD, C. J., dissents.

BLACKBIRD, Chief Judge (dissenting).

I cannot concur in the Majority opinion in this case. That opinion remands the case for a new trial, apparently on the theory that the jury at the previous trial was deficiently instructed, and consequently, did not determine a necessary issue of fact.

Said opinion says, among other things:

"The question of whether Texaco exercised control over Anderson and his employee *in the activities which resulted in the injuries complained of* was not submitted to the jury." (Emphasis mine).

I dispute this statement.

It will be remembered that plaintiff's decedent, Jimmy Alexander, was killed in an explosion and fire ignited when the Texaco station employee, Clarence L. Little, was cleaning out a truck's gasoline tank preliminary to selling the truck's operator a refilling of Texaco gasoline. Whether Little was doing this in furtherance of the filling station's agency agreement entered into by said station's lessee and operator, Anderson, with Texaco, for said station to sell Texaco gasoline exclusively, was the crucial issue in this case; and, in my opinion this issue was properly and *squarely* pre-

sented to the jury principally by the following instructions given by the trial court:

## "INSTRUCTION NO. 10.

"If you find from a preponderance of the evidence that Clarence L. Little *at the time of the injury* to the plaintiff's decedent was operating and engaged in employment by Anderson in Anderson's capacity as an independent contractor, then your verdict must be *for the defendant*. Or if you find that Little was acting as an employee for Anderson in Anderson's capacity as agent for Texaco, Incorporated, in the sale of gasoline, but *was not acting within the scope of that agency* at the time of the accident and injury, then your verdict must be *for the defendant*, Texaco, Incorporated.

## "INSTRUCTION NO. 11.

"You are further instructed that Clarence L. Little *so far as he was employed by Bob H. Anderson for the purpose of carrying out the duties of Anderson as an agent for defendant, Texaco, IN THE SALE OF GASOLINE, and so long as Little was engaged in the scope of the agency of Anderson with the defendant, Texaco, incorporated,* and in the scope of his employment *Little was an agent of defendant, Texaco, Incorporated,* and the *defendant would be liable* for the acts of negligence of Little *while so engaged, if any*." (Emphasis mine).

With obvious reference to the above-quoted instructions (and perhaps others), the Majority opinion correctly states:

"Insofar as the questions involved in this appeal are concerned, the precise question of fact submitted to the jury was whether Little's *activities at the time of the explosion and fire were in connection with his employment by Anderson* in the general operation of the filling station business, or in connection with his employment by Anderson *in the carrying out of Anderson's duties as Texaco's agent."* (Emphasis mine).

The Majority opinion then follows with a statement, a part of which is that "* * * the written contracts between the parties did not justify a peremptory instruction * * * that Anderson was Texaco's agent for the purpose of the sale of gasoline * * *". As the justification for this conclusion, the sentence rather ambiguously adds "* * *, since the contracts do not show * * * that Texaco retained the right to control Anderson or his employees in respect to *the transaction out of which the injury arose."* (Emphasis mine).

What was the "transaction out of which" Jimmy Alexander's injuries and death "arose"? As I have indicated, it was cleaning out a customer's gasoline tank preparatory to refilling it with Texaco gasoline. Did not Instructions numbered "10" and "11" submit to the jury the question of whether this cleaning out the tank was a part and parcel of, and necessarily involved in, a prospective sale of Texaco gasoline to refill that same tank, for which such sale Little's employer, Anderson (and/or the filling station leased by him) was undoubtedly an agent for Texaco, Incorporated? I say that the instructions *in the trial involved here* did effectively submit that question for the jury's determination. I think mere examination of the court's above-quoted instructions is sufficient to contradict the majority opinion's above-quoted statement that: "The question of whether Texaco exercised control over Anderson and his employee in the activities which resulted in the injuries complained of was not submitted to the jury." Since, in my opinion, this question *was submitted*, and *has been answered* in the administrator's favor by the jury's verdict and the trial court's judgment, I think the majority opinion unnecessarily and unjustly subjects him to a second trial for a re-determination of that same question.

For the foregoing reasons, I dissent.