NORTH SIDE STATE BANK (Federal Deposit Insurance Corporation by substitution), Plaintiff–Appellant,

v.

The BOARD OF COUNTY COMMISSION-ERS OF TULSA COUNTY, Oklahoma, Don E. Austin, Clerk of the District Court of the County of Tulsa, Oklahoma; John F. Cantrell, County Treasurer of the County of Tulsa, Oklahoma; Waldo E. Jones, Sr.; Waldo E. Jones II; Waldo E. Jones II & Associates, Inc.; and Seaboard Surety Company, Defendants–Appellees.

No. 77150.

Supreme Court of Oklahoma.

March 29, 1994.

Rehearing Denied May 3, 1995.

Lavender, V.C.J., and Simms, Kauger and Summers, JJ., concurred in result.

James R. Ryan, Horace D. Ballaine, Conner & Winters, Tulsa, for appellant.

David Moss, District Atty., M. Denise Graham, Asst. Dist. Atty., Tulsa, for appellees.

OPALA, Justice.

The dispositive issue before us is whether the board of county commissioners is liable to a bank on a court clerk's depository voucher (delivered to a lawyer in compliance with a court order and cashed at the bank upon a payee's forged endorsement) either (1) as the voucher's drawer under the Uniform Commercial Code's [UCC] "Impostor Rule"[1] or (2) as a principal of the county treasurer or court clerk?  We answer in the negative.

---

1. For the pertinent provisions of the Uniform Commercial Code's impostor rule, see 12A O.S. 1981 § 3–405(1)(a), *infra* note 37.

## I

### THE ANATOMY OF LITIGATION

This controversy arose in an *interpleader action* brought by the Life Insurance Company of North America, which had been unable to locate a beneficiary under the policy of its deceased insured, Phillip W. Carter. Patricia Butler was identified as one of the insured-designated recipients. Naming as defendants Patricia Butler, Patricia Ann Love Carter and George S. Carter, individually and as personal representative of the Phillip W. Carter estate, the insurer *qua* stakeholder in the action tendered $75,000.00 to the Tulsa County Court Clerk [Clerk]. The interpleaded funds, which could not be withdrawn from the account without a court order, were invested in a short-term renewable certificate of deposit.[2]

Shortly thereafter, Mickey June Jones [client], holding herself out as Patricia Butler, employed Waldo E. Jones II and Waldo E. Jones, Sr. to secure her share of the interpleaded funds. Following a December 18, 1984 hearing on her claim, the trial court ruled Patricia Butler entitled to $75,000.00 less poundage and ordered the funds to be delivered to her through her lawyer of record, Waldo E. Jones II.[3] In compliance with the court's order, the Court Clerk issued on the same day a "court fund depository voucher" payable to Patricia Butler for $73,254.31 (the amount due her less poundage). First "registered" by the county treasurer [Treasurer], the voucher was then hand-delivered by the Court Clerk to Waldo E. Jones II, Esq., as counsel of record in the case for Patricia Butler.

The next day, December 19, 1984, Waldo E. Jones, Sr., accompanied by the client, presented the voucher for payment at North Side State Bank [NSSB]. *NSSB did not require the client to produce any identification before cashing the voucher endorsed by her as "Patricai Butler."* It relied solely on (1) the lawyer's representations—he was a long-time NSSB depositor and customer—that she was in fact the named payee, (2) Waldo E. Jones, Sr.'s "guarantee endorsement" on the voucher, (3) the lawyer's assurance that supporting documentation was available to identify his client as the named payee of the court-ordered check, and (4) the lawyer's assurance that the voucher had been obtained in connection with a court proceeding. After cashing the voucher, NSSB issued its cashier's check payable to Patricia Butler for the amount of insurance proceeds *less* the sum withheld for her attorney's fees. Upon the payee's endorsement as "Patrica Butler," NSSB then cashed the cashier's check.

2. The district court order of November 29, 1984 directed the Court Clerk to invest the interpleaded funds in "a 30-day renewable Certificate of Deposit account to abide the orders and final judgment of the Court."

3. The district court's December 18, 1984 order states in pertinent part:
"That the defendants ... George Carter, individually, and George S. Carter, Personal Representative of the estate of Phillip W. Carter, deceased, disclaims any interest in and to the insurance proceeds involved herein and state that the defendant Patricia Butler is one and the same person and also known as Patricia Ann Love Carter and that such proceeds should be paid to said defendant as a named beneficiary. The Court further finds that Patricia Butler is one and the same person and is also known as Patricia Ann Love Carter and is a named beneficiary on the insurance policy involved herein and as such is entitled to the balance of the interpleaded insurance funds in the amount of $75,000.00 plus any accrued interest less a reasonable attorney's fee and costs advanced for the plaintiff's attorneys....

BE IT THEREFORE ORDERED, ADJUDGED AND DECREED that defendant, Patricia Butler, have and receive the $75,000.00 interpleaded funds in the custody of the court clerk plus interest less the plaintiff's reasonable attorney's fees and costs advanced.
BE IT FURTHER ORDERED that the clerk of the court remove the said $75,000.00 interpleaded funds from the Fourth National Bank, Tulsa, Oklahoma, in the 30–day Certificate of Deposit Account when same can be effected without any penalty and that from said interpleaded funds plus the interest thereon pay to plaintiff's attorneys ... the sum of $1,559.50 as and for a reasonable attorney's fee for plaintiff's attorneys, court costs advanced and cost of certified mailing of summonses.
BE IT FURTHER ORDERED that the clerk of the court pay the balance remaining from said interpleaded funds plus interest to Patricia Butler, *c/o her attorney, Waldo E. Jones, II,* 1520 North Hartford, P.O. Box 48600, Tulsa, Oklahoma 74148. * * * " (Emphasis added.)

On December 20, 1984 the district court ordered the court clerk to stop payment on the voucher. This occurred after another woman had appeared and identified herself as the *"real"* Patricia Butler. *Before* NSSB could present the voucher for payment, the stop-payment order had reached the drawee bank (Fourth National Bank of Tulsa), which refused to honor the court clerk's voucher.

NSSB brought suit against the *Board* of County Commissioners of Tulsa County [Board], the *Treasurer* and the *Court Clerk,* to recover the money paid on the court fund voucher. The district court gave summary relief to the Treasurer and Court Clerk, concluding that *both* were immune from liability because they acted *solely* in their official capacity as mere agents of the court. The nisi prius court found the Board was not entitled to summary relief, although it was a proper party defendant in the case.

### The First Appeal—*North Side I*

The Board appealed from the nisi prius decision and NSSB cross-appealed from summary judgment for the Treasurer and Court Clerk. This court dismissed (for prematurity) the Board's appeal from summary judgment's denial.[4] The Court of Appeals affirmed the nisi prius judgment for the Court Clerk and Treasurer on the theory that both of these officials were *immune from liability.*[5]

### The Second Appeal—*North Side II*

■ Upon remand, the Board once again moved for summary judgment, this time rest-

ing its quest on the "settled law of the case."[6] The district court gave summary judgment to the Board, and NSSB now appeals from that decision. *None of the parties contends that the case presents any disputed issues of fact.*

## II

## THE SETTLED LAW OF THE CASE

■ The Board argues it is entitled to exoneration based upon the "settled law of the case" in *North Side I.* Although there the issues before the Court of Appeals were limited to whether the Treasurer and Court Clerk were necessary parties to the action and liable for the voucher, the appellate court went on to observe that "while Clerk and Treasurer's signatures are the *only signatures* which appear on the face of the depository voucher, *it was not, in truth, the Clerk or Treasurer that made or drew the voucher; rather it was the District Court that directed that such payment should be made.*" (Emphasis added.) According to the Board, these *North Side I* statements *conclusively settle* that because the critical voucher bears *no* signature of any Board member, the Board cannot be its drawer or maker.[7] We are urged that (a) by directing payment on the voucher the district court became its *de facto* drawer or maker and (b) the Court Clerk and/or the Treasurer acted *solely* as agents of the district court.

■ *Using today an analysis different from that followed by the Court of Appeals,*

**4.** North Side State Bank v. The Board of County Commissioners of the County of Tulsa, Oklahoma; Don E. Austin, Clerk of the District Court of the County of Tulsa, and John F. Cantrell, County Treasurer of the County of Tulsa, Oklahoma, Waldo E. Jones, Sr.; Waldo E. Jones II; Waldo E. Jones II & Associates, Inc.; and Seaboard Surety Company, No. 72,385, unpublished order of February 21, 1989. An order denying the motion for summary judgment is unappealable. Rule 1.50, Rules on Perfecting a Civil Appeal, 12 O.S.1991, Ch. 15, App. 2.

**5.** *North Side State Bank, supra* note 4 (October 30, 1990) (unpublished opinion) [*North Side I*]. NSSB did not petition for review by certiorari.

**6.** The "settled-law-of-the-case" doctrine operates to bar relitigation of issues that have been settled

by an earlier appellate opinion in the same case. *Mobbs v. City of Lehigh,* Okl., 655 P.2d 547, 549 n. 5 (1982); *Mullins v. Ward,* Okl., 712 P.2d 55, 61 n. 13 (1985); *Timmons v. Royal Globe Inc. Co.,* Okl., 713 P.2d 589, 592 (1986); *Reeves v. Agee,* Okl., 769 P.2d 745, 756 n. 46 (1989); *Willis v. Nowata Land and Cattle Co.,* Okl., 789 P.2d 1282, 1285 n. 10 (1990); *Panama Processes v. Cities Service Co.,* Okl., 796 P.2d 276, 283 n. 27 (1990).

**7.** The terms of 12A O.S.1981 § 3-401 provide:

"(1) No person is liable on an instrument unless his signature appears thereon.
(2) A signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature."

*we also conclude that the Treasurer and Court Clerk are not liable on the item in question.*[8] Although the earlier appeal *exonerated these officials from any liability* for the voucher—and that dispute cannot be relitigated here—*North Side I does not settle the controversy now before us—the Board's liability to the Bank.* Because in *North Side I* the Board was, *at best,* only a nominal appellee, NSSB had no opportunity to litigate its claim against that governmental body. Nothing in that earlier appeal could hence adversely affect either the Board's defense or NSSB's claim against one other.[9] The settled law of the case binds only the *adversary parties* and *their privies.*[10]

## III

### JUDICIAL IMMUNITY DOES NOT ATTACH TO THE COURT CLERK WHEN HE IS PERFORMING NONADJUDICATIVE ACTS

■ NSSB's suit sought to make the Court Clerk answerable, *not for the lawful execution of a judge's order,* in which case he would be immune under the Governmental Tort Claims Act [Act][11] to the same extent as a judge, *but rather to make him liable under that UCC rule*[12] which strikes against issuers who place an impostor in possession of a voucher.

■ If the mistaken identity of Mickey June Jones as Patricia Butler was indeed a *"judicial error", it began and ended with the court's December 18, 1984 order directing a payment.* A judicial officer is not answerable for actions in an adjudicative capacity.[13] *McCracken v. City of Lawton*[14] teaches that the government's statutory immunity from tort liability depends on the function being performed at the time in question—i.e., whether it may be characterized as legislative, adjudicative, quasi-adjudicative or executive.[15] Judicial error that is liability-free is not always available as a cloak of immunity

---

**8.** In a public-law controversy this court is free to change the theory presented by the parties below and followed by the trial court. *Burdick v. Independent School Dist.,* Okl., 702 P.2d 48, 54 n. 10 (1985); *McCracken v. City of Lawton,* Okl., 648 P.2d 18, 21 n. 11 (1982); *Reynolds v. Special Indem. Fund,* Okl., 725 P.2d 1265, 1270 (1986); *Application of Goodwin,* Okl., 597 P.2d 762, 764 (1979); *Special Indemnity Fund v. Reynolds,* 199 Okl. 570, 188 P.2d 841, 842 (1948). A judgment *must* be affirmed if it can be sustained upon any theory applicable to the controversy. *Board of Law Library Trustees v. State,* Okl., 825 P.2d 1285, 1291 n. 32 (1992); *Willis, supra* note 6, 789 P.2d at 1286–87; *Benham v. Keller,* Okl., 673 P.2d 152, 154 (1983); *Utica Nat. Bank and Trust v. Assoc. Prod.,* Okl., 622 P.2d 1061, 1066 (1981).

**9.** In the earlier "cross-appeal" the Board was, at best, *only* a nominal party appellee. Its own appeal had been dismissed. *It had no standing to prosecute a plea of its own for corrective relief from the nisi prius court's action and no relief whatever was being pressed against it by any other party in the case. North Side I settles no law that affects or binds either the Board or the Bank,* one against the other. *Willis, supra* note 6, 789 P.2d at 1285.

**10.** *Cartwright v. Atlas Chemical Industries, Inc.,* Okl., 623 P.2d 606, 611 (1981); *Missouri, K. & T. Ry. Co. v. City of Tulsa,* 113 Okl. 21, 238 P. 452, 456–457 (1925).

**11.** The pertinent terms of 51 O.S.Supp.1984 § 155(3) are:

"The state or a political subdivision shall not be liable if a loss or claim results from: * * * 3. *Execution* or *enforcement of the lawful orders of any court;* * * *." (Emphasis added.)

**12.** For the pertinent provisions of the UCC's impostor rule, see 12A O.S.1981 § 3–405(1)(a), *infra* note 37.

**13.** The pertinent terms of 51 O.S.Supp.1984 § 155(2) are:

"The state or a political subdivision shall not be liable if a loss or claim results from:

* * * * * *

2. Judicial, quasi-judicial, or prosecutorial functions; * * *."
A purely judicial act is one done by a member of the judicial department in construing the law or applying it to a particular state of facts. *In re Courthouse of Okmulgee County,* 58 Okl. 683, 161 P. 200, 201 (1916); *Ward v. Bd. of Com'rs.,* 114 Okl. 246, 246 P. 376, 378 (1926).

**14.** Okl., 648 P.2d 18 (1982).

**15.** *McCracken, supra* note 14, 648 P.2d at 20, notes that in "determining whether statutory immunity from liability will attach, the court is concerned primarily with the essential character of the governmental action for which liability is sought to be imposed." According to *McCracken,* the Governmental Tort Claims Act stands as a barrier to monetary recovery for harm dealt to property by a city's *legislative action.*

for the court clerk. Immunities, which are personal[16] or function-related,[17] are not transferable.[18] An official's immunity depends largely upon the nature of the act under review.[19]

When the judge's December 18, 1984 order directed the Court Clerk to pay the sum of $75,000 (less poundage) to Patricia Butler and to deliver the check to her counsel of record, the judge was acting in an adjudicative capacity. The court clerk, *on the other hand*, acted in an *executive capacity* when he obeyed the order by issuing and delivering the court fund voucher.[20]

## IV

## LIABILITY OF THE BOARD OF COUNTY COMMISSIONERS

■ When managing court funds the court clerk does not act as an agent of the board of county commissioners. While among the important functions of the board is that of ensuring fiscal responsibility of all officials who handle county funds,[21] its supervisory responsibility does not extend to money received by the court clerk *qua* a state court's

*bursar* (or fiscal arm). The management, operation and liability of court funds lie within the peculiar province and control of the legislature.[22] The court clerk is an independently elected county *executive* heading a service agency for the district court. In the performance of all *ministerial* court functions, the court clerk and his deputies are subject to *summary control* by the judges.[23] The act of a court clerk who issues a voucher to satisfy a claim against the court fund, which is predicated upon a preadjudicated amount ordered to be paid, is purely ministerial in nature.[24] In short, the evidentiary materials of record in this case clearly establish that the Board had *no control* over and *no role* to play in the issuance of the critical voucher. The Board cannot hence be called upon to respond in damages under the doctrine of respondeat superior.[25]

Moreover, the court clerk's functions *qua* the court's *bursar* are not *county* functions, but rather those of the *state*. The clerk's office collects court costs, filing and license fees,[26] fines and forfeitures,[27] as well as sums

**16.** Immunity is based upon a person's status—e.g., judicial officer, legislator, prosecutor, or witness in judicial proceedings. For immunity of the prosecutor and other officials, *see Powell v. Seay*, Okl., 560 P.2d 555 (1977); *see also Buckley v. Fitzsimmons*, — U.S. —, ———, 113 S.Ct. 2606, 2615–16, 125 L.Ed.2d 209 (1993) (for a qualified immunity of the prosecutor).

**17.** *McCracken, supra* note 14, 648 P.2d at 20; *Allen, infra* note 20, 769 P.2d at 1309.

**18.** Neither the state's police power (*Tenneco Oil Co. v. El Paso Natural Gas*, Okl., 687 P.2d 1049, 1059 (1984)) nor its judicial immunity may be delegated to another.

**19.** *Allen, infra* note 20, 769 P.2d at 1309; Annot., Applicability of Judicial Immunity to Acts of Clerk of Court Under State Law, 34 ALR4th 1186, 1188 § 2 (1984).

**20.** *See also Allen v. Retirement Sys. For Just. & J.*, Okl., 769 P.2d 1302, 1309 (1988), which teaches that the government is statutorily immune from civil liability for the exercise of its adjudicative power.

**21.** 19 O.S.1981 §§ 339(2), 345.

**22.** *State v. District Court of Mayes County*, Okl., 440 P.2d 700, 707 (1968); *see Herndon v. Anderson*, 165 Okl. 104, 25 P.2d 326, 329 (1933), where the court observes that since the power to

create the fund lies in the Legislature, its control is a legislative function.

**23.** *Petuskey v. Cannon*, Okl., 742 P.2d 1117, 1125 (1987); *Barrett v. Barrett*, 207 Okl. 234, 249 P.2d 88, 90–91 (1952); *Hirsh v. Twyford*, 40 Okl. 220, 139 P. 313, 315 (1913); *Matney v. King*, 20 Okl. 22, 93 P. 737, 745 (1908).

**24.** *Court Fund of Tulsa County v. Cook*, Okl., 557 P.2d 875, 878 (1976).

**25.** A principal is generally held liable for those acts of an agent which fall within the latter's authority. The act of the agent is the act of the principal. *Qui facit per alium facit per se.* This rule, called respondeat superior, rests on the premise that, when exercising delegated authority, the agent stands under the complete control of the principal. Respondeat superior is invocable to hold the principal liable for those acts of the agent which are within the latter's authority. *Texaco, Inc. v. Layton*, Okl., 395 P.2d 393, 396–397 (1964).

**26.** 28 O.S.1981 §§ 151 et seq.

**27.** The terms of 20 O.S.1981 § 1301 provide:

"All *fees, fines and forfeitures* shall, when collected by the court clerk, *be deposited by him in a fund in the county treasury designated "The*

deposited by litigants in condemnation cases,[28] interpleader suits,[29] and matrimonial cases for support and alimony.[30] *All* this money is deposited in various accounts maintained for the court clerk by the treasurer *as an agent of the state.*[31] Although the funds drawn upon for the voucher in question were not *stricto sensu* "court funds" because they represented money deposited for *disbursement to the rightful recipient,* the court clerk's function of receiving and disbursing funds of *every* character is inextricably connected, not with *county government,* but with that official's duty as state court's bursar. In managing funds not derived from county appropriations the court clerk acts as a functionary of the *state district court* rather than *as a county official. Only* when handling appropriated county funds does the court clerk function as an elected *executive* county official.[32]

In sum, *whether court funds are to be used for defraying expenses of holding court*[33] or

*are to be disbursed by court order to some party in an interpleader suit, the money is handled by the court clerk as part of a state-court operation.*[34]

## V

### THE IMPOSTOR RULE DEFENSE IS NOT AVAILABLE TO NSSB

■ NSSB claims the Board, as the voucher's drawer,[35] is liable to the bank *qua* holder in due course[36] under the impostor rule of the UCC.[37] The Board counters that it is without authority to draw against court funds and also argues that because it was not induced by an impostor to issue the voucher it cannot be liable on the forged endorsement. According to NSSB's response, the issue is not one of control, but whether the county is liable *qua* maker of a *county* warrant in the hands of a holder in due course.

Court Fund", and shall be used, from year to year, in defraying the expenses of holding court in said county. The *county treasurer shall act as an agent of the state in the care and handling of the court fund,* but his bond shall cover his obligations in regard to this fund." (Emphasis added.)

**28.** 27 O.S.1981 § 10.

**29.** 12 O.S.Supp.1984 § 2022(C); for the pertinent terms of § 2022(C), see *infra* note 46.

**30.** Rule 8.1, Rules for District Courts, 12 O.S. 1991, Ch. 2. App.

**31.** 20 O.S.1981 § 1301, *supra* note 27.

**32.** As other county officers, the court clerk receives annual appropriations from the board of county commissioners for salaries, supplies, equipment, and reimbursement for travel expenses. 19 O.S.1991 § 162.

**33.** 20 O.S.1981 § 1301, *supra* note 27. A court fund board, created by 20 O.S.1981 § 1302, is the supervisory body over the court clerk *qua* the court's bursar. A court fund claim must be acted upon by the district court's fiscal arm—the governing board of the court fund. *Cook, supra* note 24, 557 P.2d at 877.

**34.** *Mayes,* supra note 22, 440 P.2d at 707; *Herndon, supra* note 22; *Morrison v. Fry,* 208 Okl. 239, 255 P.2d 270, 272–273 (1953).

**35.** The drawer of a check or draft is the party who signs the instrument, which by its terms

orders the drawee to pay the face amount to the order of the named payee.

By calling to our attention that the official titles of the court clerk and treasurer are shown on the instrument and the name of the county is printed at the top, NSSB asserts that the county, via the Board, is the maker or drawer of the court fund voucher—just as it is the maker of all vouchers drawn on funds held by it, issued in its name and signed by its officers. This, NSSB argues, identifies the county and indicates that its officers, who are also its representatives, signed in their capacity as clerk and treasurer. Even if the court clerk or the treasurer were the drawer or maker, NSSB argues, the county must pay the judgment.

**36.** Section 3–302(1) of the UCC defines a "holder in due course" as a "holder who takes an instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." 12A O.S.1981 § 3–302. The 1991 amendment to this section has no legal effect on this appeal.

**37.** The terms of 12A O.S.1981 § 3–405(1)(a) provided:

"(1) An *endorsement* by any person in the name of a named payee is *effective* if

(a) an impostor by use of the mails or otherwise has induced the maker or drawer to issue the instrument to him or his confederate in the name of the payee; * * *." (Emphasis added.)

The 1991 amendment of § 3–405 does not affect this appeal.

The impostor rule became applicable, NSSB asserts, because the impostor induced the lawyer to present her claim to the court, which "inducement carried on through the Judge, to the Court Clerk and County Treasurer." *Our own analysis of the transaction impels us to a contrary conclusion.*

### The Impostor Rule

■■■■ In the UCC provisions that govern check fraud, losses are allocated on the basis of one's relative responsibility for their occurrence. As a general rule, when a *drawer's signature* is forged,[38] the drawee bank will bear the loss.[39] But when an *endorsement*[40] is forged, the loss is generally cast on the bank that first paid the check.[41] Losses from forged endorsements are allocated to the party best able to take precautions to prevent their occurrence. Ordinarily a forged endorsement is ineffective to pass title. This is so because one's unauthorized signature is inoperative. The apparent intent of the UCC is to *prevent* the drawer from passing the loss from forgery to innocent parties.[42]

■■■ *Known as the "impostor rule", § 3–405(1)(a)*[43] *creates an exception to the general notions that govern forged documents.*[44] This is so because this section places the loss on the drawer when one who impersonates a third person fraudulently induces the drawer to issue a check and places him in possession. The drawer in that scenario is in the best position to prevent forgery by exercising reasonable care in identifying the party for whom the check is to be issued. Under this UCC exception, the impostor's endorsement on the draft, even though clearly unauthorized, is treated as effective. A true impostor case requires the presence of three elements: (1) an impostor's fraudulent representations to the drawer that he is the payee or agent of the payee; (2) the drawer's belief that he is dealing with the real payee or his agent and (3) a conscious and intentional delivery of the check to the impostor by the drawer, induced by the belief that the impostor is the person he pretends to be.[45]

We now examine the respective roles of the court clerk, the county treasurer, and the client's lawyer to determine whether the § 3–405(1)(a) exception should apply to this case.

**38.** A forgery is a form of an "unauthorized signature" fraudulently made. An *unauthorized signature* or endorsement is one "made without actual, implied or apparent authority and includes a forgery." 12A O.S.Supp.1984 § 1–201(43). The 1988 and 1991 amendments have no legal effect on this appeal. *W.R. Grimshaw Co. v. First Nat. Bank & Tr. Co. of Tulsa,* Okl., 563 P.2d 117, 120 (1977); *Covington v. Penn Square National Bank,* Okl.App., 545 P.2d 824, 826 (1975).

**39.** *See McCarthy, Kenney, Etc. v. First Nat. Bk.,* 402 Mass. 630, 524 N.E.2d 390, 392 (1988).

**40.** An endorsement on a check is the signature of its holder, which passes title to the check. 12A O.S.1981 §§ 3–202(2), 3–204. Section 1–201(20) defines a "holder" as a person who is in possession of a check drawn, issued, or endorsed to him or his order. The 1991 amendments of these sections do not affect the issues before us in this case.

**41.** The *rationale* for the distinction made between forgeries *of drawers' signatures* and forgeries of *endorsements* is that "the drawee is in a position to verify the drawer's signature by comparison with one in his hands, but has ordinarily no opportunity to verify an endorsement." Comment 3 to 12A O.S.1981 § 3–417. The 1991 amendment of this section has no legal effect on the issues in this appeal. *Grimshaw, supra* note 38, 563 P.2d at 120; *Covington, supra* note 38, 545 P.2d at 826; *McCarthy, supra* note 39, 524 N.E.2d at 392.

**42.** 12A O.S.1981 § 3–404(1). *See Covington, supra* note 38, 545 P.2d at 826; George G. Triantis, Allocation of Losses From Forged Indorsements on Checks and the Application of § 3–405 of the Uniform Commercial Code, 39 Okl.L.Rev. 669, 670–677 (1986); Richard Harbus, the Great Pretender—a Look at the Impostor Provision of the Uniform Commercial Code, 47 Cin.L.Rev. 385, 386–389 (1978); Annot., 81 A.L.R.2d 1365 (1962).

**43.** For the pertinent provisions of 12A O.S.1981 § 3–405(1)(a), see *supra* note 37.

**44.** The impostor rule *has no counterpart section in the Uniform Negotiable Instruments Law,* although its provisions, to some extent, reflect pre-Code jurisprudence. *See* William Everett Britton, Bills and Notes, § 151 (2d ed. 1961).

**45.** Triantis, *supra* note 42 at 679–684; Harbus, *supra* note 42 at 396–409; Annot., *supra* note 42 at 1367.

### The Court Clerk's Role QUA Maker of a Depository Voucher Drawn on Interpleaded Court Funds On Deposit in a Court Fund Account

In an interpleader action, the district court may order that the money in controversy be paid into court or, as here, be invested in an interest-bearing account.[46] The court clerk is responsible for making certain that these funds are properly recorded, deposited, invested, and disbursed in compliance with the court's order.[47] When funds are paid into the court pursuant to an order, the court clerk (a) gives a receipt to the party who tendered the money, (b) prepares deposit slips for funds collected that day, and (c) deposits them with the county treasurer, who places them in a separate "court fund account" and then deposits them in a local bank.

When the interpleaded funds in controversy were deposited with the Court Clerk in November 1984, the district court ordered the Court Clerk to invest them in a short-term interest-bearing account. In compliance with the December 18, 1984 order, the clerk withdrew the funds from this account and issued a voucher to Patricia Butler in care of Waldo E. Jones II, her attorney of record. *At no time before the voucher's issuance did he directly talk to or have contact with Jones' client. Rather, he merely responded to a court order, delivered by a court officer, by issuing a voucher on interpleaded court funds payable to a party-defendant in the case. He then, as ordered, delivered the voucher to her counsel of record.* When the Court Clerk was ordered to stop payment on the check the next day, he notified the Treasurer who contacted the drawee bank where the funds were on deposit.

### The County Treasurer's Role QUA Custodian Or Registrar

The county treasurer is designated the official depository for all monies that "may be received by any county officer, board or commission"[48] and is obligated to receive all "monies which by law are directed to be paid to him."[49] Interpleaded court funds are disbursed on what is commonly called a depository voucher prepared and signed by the court clerk or one of his authorized deputies. The court clerk can withdraw the interpleaded funds *only* when he receives an order to pay the money out. The voucher is then brought to the treasurer "for registration" in a book called a *payment register.*[50] At that time the treasurer checks to see (a) if the voucher is signed by the proper person and (b) that funds are available in the account. The treasurer *"certifies" (or approves of) registration* by *his official signature* on the voucher, which is then returned to the court clerk. The treasurer plays but a *nominal role in the disbursement of interpleaded court funds* —that of a custodian and a check registrar. The mere placement of that official's signature on a court fund voucher does not operate to transform his status from registrar/custodian to drawer. Likewise, the placement of the name "Tulsa County, Oklahoma" at the top of the voucher does not make the Board liable on the instrument *qua* drawer under § 3–405(1)(a).[51]

Assuming the Treasurer and Court Clerk were *both* drawers of the critical voucher, the impostor rule would still not be invocable against them. It was the court's order rather than an *impostor who induced these county officials to draw the voucher and to deliver it to the named lawyer both in the order and on the court's appearance docket.*

---

**46.** The terms of 12 O.S.Supp.1984 § 2022(C) provide in pertinent part:
"C. The court may make an order for the safekeeping of the subject of the action or for its payment or delivery into the court or to such person as the court may direct...."

**47.** 12 O.S.1981 § 27; 12 O.S.Supp.1984 § 2022. The court clerk may charge a fee for receiving and paying out money in compliance with the law or court order. 28 O.S.1981 § 31.

**48.** 19 O.S.1981 § 681.

**49.** 19 O.S.1981 § 623.

**50.** The county treasurer must enter every warrant paid by him in a payment register. 19 O.S.1981 § 633.

**51.** For the text of 12A O.S.1981 § 3–405(1)(a), see *supra* note 37.

### The Lawyer's Status As An Officer Of The Court

The payee's lawyer presented the Court Clerk with an order directing that official to prepare a voucher (for $75,000.00 less poundage) payable to Patricia Butler and to deliver it to that person's lawyer.[52] The Court Clerk acted in conformity to the applicable standards of legal conduct when he issued the voucher and delivered it to Waldo E. Jones II. The lawyer, an officer of the court,[53] is presumed to have authority to act for a client.[54] Unless a court clerk has reason to believe a lawyer's authority may be subject to question,[55] he has not only the right but also the duty to regard the lawyer as armed with authority to act for the client. The Court Clerk's *sole* duty here was to *issue a voucher* to a person named Patricia Butler and then to place that instrument in the hands of her legal counsel of record, Waldo E. Jones II. By force of law, the latter was the named payee's agent.

The scenario in which the voucher came into existence and reached the lawyer's hands *clearly does not* bring the case under the impostor rubric. It was issued in the

---

52. The pertinent portions of the Court Clerk's deposition are:

"I first became aware of the problem ... on the 18th day of December of 1984. *I followed the Court order to pay out the money to Waldo Jones, which I did....*" *Id.* at 9 (emphasis added).

"We withdrew the money from the bank. We wrote a county voucher to one Patricia Butler. And as the order ordered me to do, *I hand delivered the voucher and the amount of money, that was required by the judge, to Waldo Jones, II. And at no time did I ever see or meet this Patricia Butler.*" *Id.* at 10 (emphasis added).

"The order in this one—and it was brought to me, I believe, by Mr. Jones, Waldo Jones, III,—II, rather, and pointed out that we were to make the checks out, so—which we did—or I call them checks, the vouchers. It's our county voucher that we issue—not a county voucher, but *court fund voucher. Id.* at 11–12 (emphasis added).

"... [I]n the order, Mr. Jones did point out that I was to give him the money. And it is in the order, signed by Judge Scott, says to deliver the check ... and give it to Waldo Jones, which I did." *Id.* at 12.

"*We prepare the vouchers.* We send them to the county treasurer to be registered. They are no good until they go through the county treasurer. The county treasurer then registers them and then they are sent back to us and then we can send them out as payment.... In other words, I cannot write vouchers and then hand them to someone. *It has to be registered.*" *Id.* at 12–13 (emphasis added).

"... I made the court fund voucher payable to a Patricia Butler. We issued the voucher, took it to the treasurer's office, it was registered. It was brought back and *I handed that court fund voucher to Waldo Jones,* as directed in the Court order." *Id.* at 15 (emphasis added).

"Everything that I have done in this case has been pursuant to Court order. And from the very beginning, it's due to the statutes, the State of Oklahoma. That's when the money was first brought to us to be filed as an interpleader. I wrote a receipt, as directed by the statutes, the State of Oklahoma. I deposited the money, according to the statutes, the State of Oklahoma. I invested the money, according to the District Judge's order. I paid the money out to Mr. Jones, pursuant to District Court order. I put stop payment on the check, pursuant to District Court order." *Id.* at 18.

53. The terms of Art. I § 2, Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S.1981, Ch. 1, App. 1, state:

"Attorneys admitted to practice law in Oklahoma are a part of the judicial system of Oklahoma and *officers of its courts.*" (Emphasis added.)

*In re Shoemake*, 168 Okl. 77, 31 P.2d 928–929 (1934).

54. The terms of 5 O.S.1981 § 5 provide in pertinent part:

"* * * Any attorney performing any service for remuneration and which service has or would have a bearing upon the direction or outcome of the case and where the relation of attorney and client exists as to the particular matter being litigated, whether briefing, appearing or other service, and whether temporary or continuous in nature, *shall be made an attorney of record in such matter.*" (Emphasis added.)

The terms of 5 O.S.1991 § 4 are:

"*An attorney and counselor has power to receive money claimed by his client in an action* or proceeding during the pendency thereof, or afterwards, unless he has been previously discharged by his client, and, upon payment thereof, and not otherwise, to discharge the claim or acknowledge satisfaction of the judgment." (Emphasis added.)

55. *See* 5 O.S.1981 § 5, *supra* note 54. The authority of a lawyer to appear for the one whom he is representing in court raises a rebuttable presumption. *Cummins v. Chandler*, 186 Okl. 200, 97 P.2d 765, 767 (1939); *Burkhart v. Lasley*, 182 Okl. 43, 75 P.2d 1124, 1125–1126 (1938); *In re Hess' Estate*, Okl., 379 P.2d 851, 856 (1963); *Merchants Mut. Bonding Co. v. State ex rel. Nesbitt*, Okl., 438 P.2d 931, 934 (1968).

*regular course of* courthouse business. No impostor here fraudulently induced the Court Clerk to issue and hand over a voucher to the *wrong person.* Neither can we view the earlier false in-court self-identification of the client as Patricia Butler to create an impostor scenario in the UCC *sense* of the term. The court's order *directed payment to a correctly named beneficiary*—also identified as a defendant in the case—by voucher to be issued and delivered to her counsel of record—an officer of the court.

■ *NSSB cashed the critical voucher upon a forged endorsement.* Because the impostor rule is not invocable, the endorsement by the client—a forgery—could not be effective to pass title to a holder in due course. The client's position vis-à-vis the bank was that of a *stranger* who sought to cash a check. *Before giving value and issuing its cashier's check NSSB had the duty to identify her as the named payee of the depository voucher.*

Neither can the impostor rule operate in favor of NSSB *qua* drawer of the cashier's check. The rule protects, *not the drawer,* but *only those* who take from a drawer, as issuer of the item, in circumstances that call for the impostor rule's application. NSSB must hence bear the loss from the forged endorsements on both the *court fund voucher* and on its own *cashier's check.*

*We hold that NSSB cannot invoke in this case the impostor rule against the Board.* NSSB's acquaintance with the lawyer did not relieve that bank from its duty to secure a valid endorsement from the voucher's named payee. NSSB should have verified the payee's identity rather than rely on the representations of the purported payee's lawyer.

### SUMMARY

The settled-law-of-the-case doctrine is no bar to NSSB's claim for corrective relief in this case. The Governmental Tort Claims Act absolutely shields from liability those official actions which are done in the exercise of *judicial* or *"quasi-judicial"* authority.[56] The Court Clerk is an elected *executive* official of the county who functions as bursar for

the state district courts. Because the Board of County Commissioners *has no control over interpleaded court funds,* it is not liable under the respondeat superior doctrine for the Court Clerk's acts in handling those funds. Summary judgment materials *of record clearly and conclusively* establish that, at the time of the critical voucher's issuance, the Court Clerk did not stand *vis-à-vis* the Board in an agent/principal relationship. *The Board was not a drawer of the voucher in question.* It was drawn not against county funds but against state funds on deposit in an interpleader suit. The impostor rule is not invocable against the Board because it was neither a maker nor a drawer of the critical voucher.

The trial court's summary judgment is affirmed.

HODGES, C.J., and HARGRAVE, ALMA WILSON and WATT, JJ., concur.

LAVENDER, V.C.J., and SIMMS, KAUGER and SUMMERS, JJ., concur in result.

---

■

56. *See* the pertinent terms of 51 O.S.Supp.1984 § 155(2), *supra* note 13. Today's conclusion that the court clerk's issuance and delivery of vouchers *in this case* is not shielded by the Act *does not*

*imply* that issuance and delivery of vouchers pursuant to specific judicial direction will *invariably* fall under a tort rubric.