2001 OK CIV APP 6

Kim Allyson HARTLEY, Individually; and Amber Hartley, a minor, by and through her Mother and Next Friend, Kim Allyson Hartley, Appellants

v.

Diane WILLIAMSON, Ed.D., Appellee.

No. 94,545.

Court of Civil Appeals of Oklahoma, Division No. 4.

June 20, 2000.

Certiorari Denied Nov. 7, 2000.

Approved for Publication by Order of the Supreme Court Jan. 18, 2000.

Joe M. Fears, Barber & Bartz, Tulsa, Oklahoma, for Appellants.

R. Jack Freeman, Feldman, Franden, Woodard & Farris, Tulsa, Oklahoma for Appellee.

## OPINION

STUBBLEFIELD, J.

¶ 1 This is an appeal from summary judgment granted to a court-appointed psychologist in a multi-theory action for damages brought by a mother and daughter counseled by the psychologist. The appeal has been assigned to the accelerated docket pursuant to Supreme Court Rule 1.36, 12 O.S. Supp. 1999, ch. 15, app. 1. Based on review of the record on appeal and applicable law, we affirm.

¶ 2 This action arises from child custody proceedings between the divorced couple, Kim Eugene Hartley (Father) and Kim Allyson Hartley (Mother). The couple was divorced in 1990 with Mother granted custody of the parties' two minor children, C.H. (Son), and A.H. (Daughter). However, the legal fireworks had only just begun.

¶ 3 In 1991, Mother was found guilty of contempt for denial of Father's visitation. During the same year, Mother filed a separate court action accusing Father of sexual molestation of Daughter. However, a protective order was denied in that action, and the appellate record reflects that Mother was advised by the trial judge to obtain counseling. In 1992, Father moved to modify the divorce decree by changing custody of the children to him. In mid–1993, after a trial of the motion to modify had begun, this action apparently was settled by the parties' agreement regarding visitation changes. Then, in 1996, Father sought an emergency order to modify custody. An agreed temporary order was entered giving Father custody of Son, with a final determination regarding visitation to be made after all the parties submitted to counseling by a professional agreed upon by the parties.

¶ 4 Initial contact with a psychologist was made by Mother's attorney. While at the courthouse for the proceeding that resulted

in the agreed order, the lawyer called Dr. Diane Williamson (Doctor), who consented to act as the court-authorized counselor. Father's attorney agreed to the selection of Doctor, and the psychologist was engaged to counsel the parties as per the trial court's order.

¶ 5 Mother called Doctor, whose role she perceived as being "to determine visitation rights," briefly discussed facts and issues from her perspective, and made an appointment for herself and Daughter. At the initial meeting with Mother and Daughter, Doctor explained how she perceived her role—largely to provide information to the trial court. It is undisputed she indicated that, because her role was as a court-ordered "mediator," those being counseled were not her primary clients and information disclosed was not confidential.

¶ 6 Approximately one week after Doctor's session with Mother and Daughter, Father notified Doctor that Son's school had advised him that a person claiming to be his "aunt" had tried to pick Son up from school, but the school refused because the person was not on the authorized list. Father apparently related a fear that Mother was trying to steal the child. Later that day, the maternal grandmother called Doctor and advised that she had been the party attempting to pick Son up from school. Then, on the same day, Father brought two written witness' statements to Doctor, which stated that on the previous day, Mother, while conducting a garage sale, had informed each witness that she was planning to flee the jurisdiction with both her children.

¶ 7 The record reflects that Doctor asked Father for more information regarding Mother. Father provided various reports about Mother from prior court proceedings, including psychological evaluations. These materials generally may be characterized as depicting Mother as emotionally unstable.

¶ 8 On May 6, 1996, Father filed an application for an emergency ex-parte order giving him custody of Daughter, listing the witness statements reporting Mother's stated intention of fleeing the jurisdiction with both children. On inquiry by Father's attorney, Doctor agreed to testify at the hearing on the application.[1] Before she did so, she talked with two other doctors, who had professional knowledge of Mother, about the risk of Mother's flight. Doctor then testified at the hearing that she believed Mother was a flight risk, was preparing to flee and that the situation posed a risk of harm to the children.

¶ 9 The emergency order was entered. The record reflects that Doctor agreed with the trial judge that Daughter could be placed into Father's custody at a scheduled session the next day at Doctor's office, if no other safe arrangements could be made. Daughter was picked up at the session and put into Father's custody. However, after full hearing, the custody of Daughter ultimately was returned to Mother.

¶ 10 Mother sued Doctor, both individually and as next friend of Daughter, seeking damages for negligence, intentional infliction of emotional distress, deceit and conspiracy to commit abuse of process. However, the trial court sustained Doctor's motion for summary judgment, finding that: (1) Doctor was acting at the "request" of the court; (2) all actions undertaken by Doctor were in the best interest of the children; and, (3) Doctor was immune from civil suit because of her status as a court-appointed expert. Mother appeals.

¶ 11 Summary judgment is appropriate only when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Oliver v. Farmers Ins. Group of Companies,* 1997 OK 71, 941 P.2d 985. Therefore, as the decision involves purely legal determinations, the appellate standard of review of a trial court's grant of summary judgment is *de novo. Kirkpatrick v. Chrysler Corp.,* 1996 OK 136, ¶ 2, 920 P.2d 122, 124.

¶ 12 On review of a summary judgment record, this court will view all inferences and conclusions to be drawn from underlying facts contained in evidentiary materials in a

---

1. The appellate record indicates that Doctor did not require a subpoena but that she was apprised that one would be issued if necessary. Thus, there was some degree of compulsion behind Doctor's testimony.

light most favorable to the party opposing the motion. *Oliver,* 1997 OK 71 at ¶ 6, 941 P.2d at 987. If the uncontroverted facts support legitimate inferences favoring the well-pleaded theory of the party against whom the judgment is granted, or the judgment is contrary to substantive law, it will be reversed. *Hargrave v. Canadian Valley Elec. Coop., Inc.,* 1990 OK 43, 792 P.2d 50.

¶ 13 Mother claims the trial court committed legal error in its finding of immunity based on Doctor's court-appointed status and in finding that Doctor acted in the best interests of the children. She claims that Doctor stepped out of her court-authorized role by agreeing to be a "partisan expert." Mother also claims the trial court did not view the evidence in the light most favorable to her. We disagree with all of Mother's contentions and find that the trial court properly entered judgment.

¶ 14 In her response to Doctor's motion for summary judgment, Mother agreed with most of Doctor's statement of facts. She did vehemently deny ever making any statement to anyone that she was going to flee with her children and also stated additional information about the relationship of the "witnesses" with Father's new wife. However, Mother's response did not put into dispute the status of Doctor. Doctor was undisputedly a court-authorized professional witness, intended to gain information relative to the parties' custody dispute and to give that information to the trial court with a recommendation regarding child visitation.

¶ 15 Although couched as claims for negligence, intentional infliction of emotional distress, deceit and conspiracy to commit abuse of process, each claim is based on the allegation that Doctor *testified* against Mother and Daughter in the emergency ex-parte hearing. Yet the immunity of parties and witnesses from subsequent liability in damages for their testimony in judicial proceedings was well established in English common law. *Briscoe v. LaHue,* 460 U.S. 325, 331, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). In *Kirschstein v. Haynes,* 1990 OK 8, 788 P.2d 941, the Oklahoma Supreme Court went further than the common law rule by extending the immunity of witnesses to communications made preliminary to judicial or quasi-judicial proceedings. The *Kirschstein* court also recognized that the rule, originally granting immunity in defamation cases, also extended to immunity from a damage suit for intentional infliction of emotional distress *arising from the same circumstances as a defamation claim.* Here, the latter rule also would cover the negligence, deceit and conspiracy claims of Mother and Daughter, which are all founded on Doctor's testimony at a judicial proceeding. Thus, we conclude that Doctor does have immunity and that the immunity is from each claim of Mother and Daughter.

¶ 16 The immunity of Doctor, as a court-authorized witness, is of a greater scope than that of a witness called by one of the parties. Doctor's role was that of an advisor to the trial court, playing an integral part in the judicial decision-making process. Performing an adjudicative act, Doctor was cloaked with judicial immunity. *See North Side State Bank v. Board of County Comm'rs of Tulsa County,* 1994 OK 34, 894 P.2d 1046. However, because the witness status of Doctor is sufficient to immunize Doctor from this lawsuit, we will not further address this issue.

¶ 17 Although this holding of witness immunity is dispositive of the appeal, we also must note that the trial court's factual determination that Doctor's actions were in the best interest of the children was a correct one. The evidentiary materials, viewed in the light most favorable to Mother and Daughter, establish that Doctor was confronted with reasonable evidence that the children were in danger. Doctor had been given two witness statements that contained unequivocal affirmations that Mother intended to flee with her children, coupled with clear proof that Mother also may have attempted to have Son, who was not in her legal custody, withdrawn from his school. Doctor knew something of Mother's instability from her own previous observations and verified Mother's propensities with two other mental health professionals who had prior contact with Mother. Under such circumstances, Doctor had a clear duty to assist the trial court in protecting the children. And

not one iota of evidence in the record indicates any other motive on the part of Doctor.

¶ 18 Based on the foregoing analysis, the judgment of the lower court is AFFIRMED.

¶ 19 GOODMAN, C.J., Presiding, and REIF, J., concur.