Leon ANDERSON, individually and as special administratrix and personal representative of the Estate of Henry Lee Richard, Deceased, Josephine Goodbear, individually and as mother and next friend of Henry Richard, Jr., a minor, Stacy Richard, a minor and Brandon Richard, a minor, Michael Richard and Steven L. Richard, Plaintiffs–Appellants,

v.

Edward EICHNER, Randy Morgan, a/k/a R.R. Morgan, Lee Serbousek, Edward Kuekes, Ronald Greenfield, John P. Kuebler, Oklahoma Memorial Hospital and the State of Oklahoma Teaching Hospitals, Defendants–Appellees.

Uttara Karnik BHAT, a totally incapacitated adult, and Chandrashekar A. Bhat, as Husband and Guardian of the person and property of Uttara Karnik Bhat, a totally incapacitated adult; and Martand R. Karnik and Mrs. Shashikala Martand Karnik, Parents of Uttara Karnik Bhat, Plaintiffs–Appellants,

v.

STATE of Oklahoma ex rel. DEPARTMENT OF HUMAN SERVICES— OKLAHOMA MEMORIAL HOSPITAL and ex rel. Board of Regents of the University of Oklahoma; Ralph Lazzara, M.D.; John Harvey, M.D.; Eliot Schechter, M.D.; John Randolph, M.D.; and Nick Twidale, M.D., individually; and the College of Medicine Private Practice Plan, a Joint Venture Medical Partnership, a/k/a the University of Medicine Professional Practice Plan, Defendants–Appellees.

Nos. 79517, 79507.

Supreme Court of Oklahoma.

Dec. 6, 1994.

Stan Twardy, Oklahoma City, and Ed Abel, Donald E. Schroeder, and Lynn B. Mares, Abel, Musser, Sokolosky & Assoc., Oklahoma City, for appellants in No. 79507.

John Wiggins and Cynthia L. Sparling, Short, Barnes, Wiggins, Margo & Adler, Oklahoma City, for appellees in No. 79507.

Richard E. Hornbeek, Abowitz & Welch and Hornbeek, Krahl & Vitali, Oklahoma City, for appellants in No. 79517.

Kevin Driskill, Oklahoma City, for appellee Eichner in No. 79517.

J. Roger Hurt, Inona J. Harness, Pierce, Couch, Hendrickson, Johnston & Baysinger and Haven Tobias, Pierce, Couch, Hendrickson, Baysinger & Green, Oklahoma City, for appellees Morgan and Serbousek in No. 79517.

Steven R. Hickman, Frasier & Frasier, Tulsa and Howard K. Berry, Jr., Oklahoma City, for amicus curiae in Nos. 79517 and 79507, Oklahoma Trial Lawyers Ass'n.

Ed Kelsay, Oklahoma City, for amicus curiae in Nos. 79517 and 79507, Oklahoma State Medical Ass'n.

OPALA, Justice.

The first-impression issue dispositive of these two appeals is whether the Governmental Tort Claims Act[1] shields faculty physicians, resident physicians and interns—who are either teaching or participating in an educational program at Oklahoma Memorial Hospital—from tort liability in *medical malpractice suits* brought against them in their status as state employees. We answer in the negative. We conclude today that (a) the Governmental Tort Claims Act specifically takes out of the state immunity purview those acts of physician educators and students which fall under the rubric of "medical practice"; (b) for all such acts the physician teachers and students are individually liable according to the principles of general tort law, except that the total individual liability of resident physicians and interns stands limited to $100,000.00; and (c) the district court's summary judgments for the defendant physicians must be reversed with the causes remanded in both actions.

I

THE ANATOMY OF LITIGATION

A.

Cause No. 79,517—The *Anderson* Claim

The *Anderson* claim arose when Henry Richard [Richard] died on November 12, 1986 from complications of a surgically attempted central line placement[2] procedure performed at Oklahoma Memorial Hospital [OMH]. During this procedure, Richard's lung and subclavian vessel sustained multiple punctures which resulted in intrapulmonary and pleural hemorrhage.

When in the course of rendering medical treatment to Richard, Dr. Randy Morgan, a resident intern, and Dr. Lee Serbousek, a resident physician, were both participating in a graduate medical education program at the University of Oklahoma Health Sciences Center (OUHSC). Dr. Edward Eichner, a professor of medicine and Chief of the Hematology Section, Department of Medicine at OUHSC, was a faculty physician who supervised and instructed Drs. Morgan and Serbousek regarding Richard's treatment. All three of these defendants, either as teacher or student in the OUHSC's educational program, were involved in making treatment decisions and administering medical care to Richard.

Richard's next of kin and the representative of his estate brought a wrongful death action for medical malpractice against defendants Eichner, Serbousek and Morgan. The plaintiffs also sued OMH and the State of Oklahoma Teaching Hospitals.[3] The trial court gave summary judgment to the three physicians.[4] Their quests for summary relief stood rested on immunity from tort liability conferred by the Governmental Tort Claims

1. 51 O.S.1991 §§ 151 et seq.

2. Some chemotherapeutic and antibiotic regimens require extended vascular access. This is accomplished with the catheterization and insertion of a central venous line (CVL) into the patient's cephalic, subclavian, internal or external jugular vein. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY (Robert Berkow, M.D. et al. eds., 16th ed. 1992). Richard was being treated for leukemia and was receiving intravenous fluids and antibiotics through a central line catheter. When on November 12, 1986 his existing CVL began leaking, surgery was performed to replace it with a new catheterization line on the patient's opposite side.

3. The plaintiffs' claims against OMH and the State of Oklahoma Teaching Hospitals remain pending in the trial court.

4. The pertinent portions of the April 27, 1992 summary judgment in the *Anderson* action are:

"This Court ... finds that the Defendants, Edward Eichner, M.D. (physician faculty member), Randy Morgan, M.D. (resident intern physician), and Lee Serbousek, M.D. (resident physician), are immune from suit under the Governmental Tort Claims Act pursuant to 51 O.S. § 151, et seq.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, that the [physician] Defendants' ... Motions for Summary Judgment should be and hereby are granted, and that judgment is granted as a matter of law in favor of these aforesaid Defendants and against the Plaintiffs."

Act[5] because, when the medical services in question were rendered, they were either engaged in teaching duties or participating at OUHSC as students in an educational program.[6]

## B.

### Cause No. 79,507—The *Bhat* Claim

The *Bhat* claim arose on November 27, 1989 when Uttara Karnik Bhat [Bhat] underwent an elective valvuloplasty to correct a narrowing of her heart's mitral valve in the OMH heart catheterization laboratory. Recommended by Dr. Ralph Lazzara, this procedure was performed by Drs. John Harvey and Eliot Schechter, all faculty physicians at OUHSC. Drs. Jatin Amin and Nicholas Twidale, resident physicians, also participated in its performance. Dr. Sunil Lulla, another resident physician, was present and observed Bhat's heart catheterization.

During the procedure Bhat's heart was perforated, causing pericardial bleeding which interfered with her heart functions.

Dr. John Randolph, an assistant professor of thoracic surgery, performed emergency surgery to correct the perforation while two resident physicians observed the operation. Because of her diminished heart functions, Bhat's brain became oxygen-deprived for a period of time. She remained in a comatose vegetative condition until her death on December 19, 1992.[7]

Bhat's next of kin brought a medical malpractice action against the individual physicians and the State of Oklahoma Department of Human Services [DHS], OMH and the College of Medicine Private Practice Plan [PPP].[8] The defendant physicians sought summary judgment, arguing that they were immune from liability for torts committed while engaged in teaching duties or while participating in a graduate medical education program at OUHSC.[9] The trial court gave summary judgment to the physicians, ruling that their status (as state employees acting within the scope of their employment) rendered them immune from civil liability.[10]

5. *Supra* note 1.

6. *See* 51 O.S.Supp.1986 § 152, *infra* note 21.

7. In Cause No. 79,507 (the *Bhat* claim) we have received voluminous deposition material that has been designated for inclusion in the appellate record. An appellate court cannot take notice of any item that was not properly before the trial court. *Hulsey v. Mid–America Preferred Ins. Co.*, Okl., 777 P.2d 932, 936 (1989). *See also Frey v. Independence Fire and Cas. Co.*, Okl., 698 P.2d 17, 20 (1985). Deposition testimony sought to be used as evidentiary material in the summary judgment process must be placed into the record in compliance with Rule 13, Rules for the District Court, 12 O.S.1991, Ch. 2, App., which provides in pertinent part:

"a. A party may move for judgment in his favor on the ground that the depositions, admissions in the pleadings, stipulations, answers to interrogatories and to requests for admissions, affidavits, and exhibits on file, filed with his motion or subsequently filed with leave of court show that there is no substantial controversy as to any material fact. The motion shall be accompanied by a concise written statement of the material facts as to which the movant contends *no genuine issue exists* and the reasons why summary judgment should be granted. *Reference shall be made in the statement to the pages, paragraphs and/or lines of the depositions*, admissions, answers to interrogatories and to requests for admissions, affidavits, exhibits and other materials whether filed by the moving party or by the adverse party, *and a copy of the material relied on shall be attached to the statement.*" [Emphasis added.]
*All deposition material to be reviewed on appeal must be both filed in the court clerk's office and shown by the record to have been tendered for the trial court's consideration. See Hulsey, supra,* 777 P.2d at 935–36. Only a few excerpts of the depositions on file below actually qualify as part of the record here. We do not consider those materials which fail to meet the law's requirements for incorporation into an appellate record.

8. The *Bhat* suit initially included claims against the following physicians: Drs. Lazzara, Harvey, Schechter, Randolph, Twidale, Lulla and Amin. The action against Drs. Lulla and Amin was dismissed without prejudice on February 7, 1992. The plaintiffs' claim against DHS, OMH and the College of Medicine Private Practice Plan is pending in the district court.

9. *See* 51 O.S.1991 § 152, *infra* note 21.

10. The pertinent portions of the summary judgment in the *Bhat* cause, filed on April 22, 1992, are:

"The Court finds that defendants, Ralph Lazzara, M.D., John Harvey, M.D., Elliott [sic] Schechter, M.D., John Randolph, M.D., were physician faculty members at the University of Oklahoma Health Sciences Center at the time of the events complained of and, were employ-

## C.

### The Nature of the Appeals

The plaintiffs originally sought corrective relief in this court by a petition for certiorari to review a certified interlocutory order. By this court's earlier direction the cases came to be recast as appeals which are authorized by 12 O.S.1991 § 1006 [11] for appellate review in advance of final adjudication of all multiple claims or multiple parties. The district court's certified orders [12] were deemed the functional equivalent of judicial statements, required by § 1006, (a) that "no just reason" exists for delaying an immediate appeal and (b) that judgments for the physicians may be entered at once. The appeals stand consoli-

dated for disposition by a single opinion. We now take cognizance of the cases and reverse the summary judgments in both actions.

## II

### THE GOVERNMENTAL TORT CLAIMS ACT DOES NOT EXTEND IMMUNITY TO THE DEFENDANT PHYSICIANS FOR TORTS OCCURRING WHILE THEY WERE PRACTISING MEDICINE

The individual physicians' immunity from liability turns on our construction of the Governmental Tort Claims Act.[13] The common-law doctrine of sovereign immunity was

---

ees of the State of Oklahoma acting within the scope of their employment and accordingly are immune from liability for the alleged torts pursuant to 51 O.S. § 151 et seq. Further, the Court finds that defendant, Nick Twidale, M.D., was a third-year resident or fellow in cardiology at the University of Oklahoma Health Sciences Center at the time of the events complained of and was an employee of the State of Oklahoma acting within the scope of his employment. Defendant, Nick Twidale, M.D., is also immune from liability for his alleged torts pursuant to 51 O.S. § 151 et seq. "IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment filed on behalf of [the physician] defendants ... is hereby granted and that these defendants are granted judgment as a matter of law."

**11.** The pertinent terms of 12 O.S.1991 § 1006, effective June 1, 1991, *were*:

"When more than one claim for relief is presented in an action ... or *when multiple parties are involved,* the court may direct the preparation and filing of a final judgment as to one or more of the parties only upon an express determination that there is no just reason for delay and upon an express direction for the filing of judgment. In the absence of such determination and direction, *any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties,* and the order or other form of decision is subject to revision at any time before judgment adjudicating all the claims and the rights and liabilities of all the parties is filed with the court clerk." [Emphasis added.] By amendments enacted in 1993 (Okl.Sess.L. 1993, Ch. 351, §§ 23, 30, eff. Oct. 1, 1993) § 1006 was amended and recodified as 12 O.S.Supp.1993 § 994. For a discussion of § 1006 requirements, see *Tinker Inv. & Mortg. v.*

*Midwest City,* Okl., 873 P.2d 1029, 1034–1035 (1994).

**12.** In Cause No. 79,517 (the *Anderson* claim) the trial court's certified interlocutory order, filed on April 27, 1992, states in pertinent part:

"[T]his Court hereby finds that pursuant to Rule 1.50 of the Oklahoma Rules of Appellate Procedures in Civil cases, that ... [the] Order granting Summary Judgment on behalf of Drs. Eichner, Morgan and Serbousek affects a substantial part of the merits of this controversy, and therefore should be certified for immediate appeal as an interlocutory Order, in order to materially advance the ultimate termination of the litigation.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that this court's Order ... granting summary judgment to [the physician] defendants ... should be certified as an interlocutory order, pursuant to Rule 1.50 of the Rules of Appellate Procedure in civil cases."

In Cause No. 79,507 (the *Bhat* claim) the trial court's order, filed on April 24, 1992, states in pertinent part:

"[T]his Court hereby finds that pursuant to Rule 1.50 of the Oklahoma Rules of Appellate Procedures in civil cases, that ... [the] Order granting Summary Judgment on behalf of Ralph Lazzara, M.D., John Harvey, M.D., Eliot Schechter, M.D., Johns [sic] Randolph, M.D., and Nick Twidale, M.D., affects a substantial part of the merits of this controversy, and therefore should be certified for immediate appeal as an interlocutory Order, in order to materially advance the ultimate termination of the litigation.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that this court's Order ... granting summary judgment to [the physician] defendants ... should be certified as an Interlocutory Order pursuant to Rule 1.50 of the Rules of Appellate Procedure in civil cases."

**13.** *Supra* note 1.

abrogated by our pronouncement in *Vanderpool*.[14] There we held that in the absence of a statute conferring partial or total immunity, the state, its political subdivisions, and employees acting within the scope of their employment would stand liable in tort in the same manner as a private individual or corporation.[15] The legislature responded to *Vanderpool's* invitation to codify Oklahoma's sovereign immunity policies by enacting the 1984 Governmental Tort Claims Act. The latter *redefined* the parameters of governmental tort liability.[16] The act provides, in § 152.1(B), that governmental immunity of the state and its political subdivisions is waived *"only to the extent and in the manner provided in"* the act.[17] Tracking *Vanderpool's* rationale, § 153 extends govern-

mental accountability to all torts for which a private person or entity would be liable, subject only to the act's specific "limitations and exceptions." [18]

■ State employees acting within the scope of their employment are relieved by § 152.1(A) of private liability for tortious conduct.[19] This immunity grant allows public employees to perform their duties and make decisions on behalf of the state free from fear of suit.[20] In the task of determining whether the defendant physicians are immune from liability for the acts in suit because of their employment status with the state, our analysis must begin with the definitional portion of the act—§ 152(5) [21]—in which state employ-

---

**14.** *Vanderpool v. State of Oklahoma ex rel. Oklahoma Historical Society,* Okl., 672 P.2d 1153, 1156–57 (1983).

**15.** *Vanderpool, supra* note 14 at 1156–57. *See also Gunn v. Consolidated Rural Water & Sewer District No. 1,* Okl., 839 P.2d 1345, 1348 (1992); *Nguyen v. State,* Okl., 788 P.2d 962, 964 (1990).

**16.** The Governmental Tort Claims Act was effective October 1, 1985. The terms of its § 152.1 [51 O.S.1991], which have not been amended since 1984, are:

"A. The State of Oklahoma does hereby adopt the doctrine of sovereign immunity. The state, its political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts.

B. The state, only to the extent and in the manner provided in this act, waives its immunity and that of its political subdivisions. In so waiving immunity, it is not the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution."

**17.** For the text of 51 O.S.1991 § 152.1(B), see *supra* note 16.

**18.** The terms of 51 O.S.1991 § 153 provide:

"A. The state or a political subdivision shall be liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment subject to the limitations and exceptions specified in this act and only where the state or political subdivision, if a private person or entity, would be liable for money damages under the laws of this state. The state or a political subdivision shall not be liable under the provisions of this act for any act or omission of an employee acting outside the scope of his employment.

B. The liability of the state or political subdivision under this act shall be exclusive and in

place of all other liability of the state, a political subdivision or employee at common law or otherwise."

**19.** For the text of 51 O.S.1991 § 152.1(A), see *supra* note 16.

**20.** *Neal v. Donahue,* Okl., 611 P.2d 1125, 1129 (1980).

**21.** The pertinent terms of 51 O.S.Supp.1986 § 152(5) (eff. July 1, 1986), which were applicable when the *Anderson* claim arose, *provided:*

"5. "Employee" means any person who is authorized to act in behalf of a political subdivision or the state whether that person is acting on a permanent or temporary basis, with or without being compensated or on a full-time or part-time basis. Employee also includes all elected or appointed officers, members of governing bodies and other persons designated to act for an agency or political subdivision, but the term does not mean a person or other legal entity while acting in the capacity of an independent contractor. *For the purpose of this act, physicians acting in an administrative capacity, resident physicians and resident interns participating in a graduate medical education program of the University of Oklahoma College of Medicine or the Oklahoma College of Osteopathic Medicine and Surgery and faculty members of the University of Oklahoma College of Medicine and the Oklahoma College of Osteopathic Medicine and Surgery, while engaged in their teaching duties are employees of the state. Physician faculty members of the University of Oklahoma College of Medicine and the Oklahoma College of Osteopathic Medicine and Surgery not acting in an administrative capacity or engaged in teaching duties are not employees or agents of the state. However, in no event shall the state be held liable for the tortious conduct of any physician, resident physician or intern*

ees are described. Three significant components of the § 152(5) definition must be examined. These are: (a) faculty physicians acting in *an administrative capacity* or *engaged in teaching duties* and resident physicians and interns *participating in a graduate medical education program are employees of the state;* (b) faculty physicians *not acting in an administrative capacity* or *performing teaching duties are denied employee status for consideration of immunity;* and (c) *state liability for* these physicians' torts while they are *practising medicine or providing medical treatment is expressly abrogated.*

■ The cardinal rule of statutory construction calls for a judicial search to ascertain legislative intent.[22] The obvious problem here is that the activities of these physicians do not fit precisely into § 152(5)'s definitional scheme. This is so *because the conduct under scrutiny includes both elements of teaching or participating in an educational program and those of practising medicine.* Nonetheless, the plaintiffs urge that the legislature intended for these physicians to be outside the scope of their employment *whenever* they engage in the practice of medicine

or in the provision of medical or surgical treatment, even though they *also* may be acting as teacher or student. We agree.

■ Section 152(5)'s language creates a *dichotomous division of physicians* into two distinct categories: (a) teachers or students and (b) practitioners of medicine. For their tortious conduct *as teachers or students* the state is liable; for their like acts or omissions *as practitioners* the state is not. The final provision in § 152(5)[23] clearly takes the employee/teaching-physicians and employee/student-physicians out of the scope of their employment when they are practising medicine—whether for educational or other purposes—yet leaves them within the protection of respondeat superior[24] liability for those of their duties that are disconnected from treatment of patients.

■ The defendant physicians argue that § 152(5) operates only to limit the state's liability and does not waive their individual immunity from civil responsibility. We reject this notion. In interpreting a statute, the legislative act, which is to be

*while practicing medicine or providing medical treatment to patients."* [Emphasis added.]
The quoted language was not changed by the 1989 amendment of § 152 (the version in effect when the *Bhat* claim arose). The 1990, 1991, 1992 and 1993 *amendments have no effect on this litigation.* The July 1, 1986 amendment of § 152(5) *added* the fourth and fifth sentences and *altered the third sentence which earlier read:*
"For the purpose of this act, physicians acting in a nonadministrative capacity, except for resident physicians and interns, practicing at the State of Oklahoma Teaching Hospitals are not employees or agents of the state."

22. *So–Lo Oil Company, Inc. v. Total Petroleum, Inc.,* Okl., 832 P.2d 14, 18 (1992); *Humphrey v. Denney,* Okl., 757 P.2d 833, 835 (1988); *Matter of Phillips Petroleum Co.,* Okl., 652 P.2d 283, 285 (1982); *Lancaster v. State,* Okl., 426 P.2d 714, 716 (1967); *State v. Dinwiddie,* 186 Okl. 63, 95 P.2d 867, 869 (1939).

23. For the pertinent terms of § 152, see *supra* note 21.

24. Under the doctrine of respondeat superior a principal or employer is generally held liable for those acts of an agent or employee which fall within the latter's authority. *Qui facit per alium facit per se* (the act of the employee is the act of

the employer). This rule rests on the premise that, when exercising delegated authority, the employee stands under the complete control of the employer. *Texaco, Inc. v. Layton,* Okl., 395 P.2d 393, 396–397 (1964). *See also Braden v. Hendricks,* Okl., 695 P.2d 1343, 1352 (1985); *Elias v. Midwest Marble and Tile Co.,* Okl., 302 P.2d 126, 127–128 (1956); *Mid–Continent Pipeline Co. v. Crauthers,* Okl., 267 P.2d 568, 571 (1954); *World Pub. Co. v. Smith,* 195 Okl. 691, 161 P.2d 861, 863 (1945). The terms of § 152, *supra* note 21, which provide that the state shall not be liable for medical malpractice, appear to be a legislative attempt to preserve for the state the same general protective separation that is afforded private hospitals in similar situations. In most jurisdictions, the theory of respondeat superior is *not* extended to a hospital if the doctor is considered a *private contractor* operating on his/her own behalf—i.e., when a doctor-patient relationship pre-exists the patient's admission to the hospital. *See Weldon v. Seminole Municipal Hospital,* Okl., 709 P.2d 1058, 1059–1060 (1985). But, under the theory of ostensible agency, a hospital can be vicariously liable for the negligence of a physician, notwithstanding the physician's independent contractor status, when the patient looks for treatment "solely to the hospital" rather than viewing its facility as merely "the situs where his physician would treat him for his problems." *Id.*

considered in its entirety,[25] must be construed to be reasonable and consistent as a whole.[26] The legislature kept in force the *state's* immunity from liability by providing in § 155 [27] thirty carefully circumscribed exemptions. Had the legislature intended to exempt the *state* from liability for medical malpractice of faculty and student physicians, it could have explicitly done so in that section. This approach would not have been inconsistent with the overall organization and institutional design of the Governmental Tort Claims Act.

■■■ Instead, the legislature addressed the problem at hand with a proviso in § 152—a *definitional section that describes who are state employees.* The impact of this proviso is controlled by the context in which it is found. It must be construed to operate differently from the § 155 limits on state liability. Section 152's final provision is intended as a descriptive statement. It clearly lays down the rule that, although the defendant physicians might otherwise be considered state employees when involved in the educational process, they nonetheless stand outside the scope of their employment whenever they engage in the practice of medicine. Our attempt at construction need go no further. The plaintiffs are suing state employees who, by force of statutory law, were acting *outside* the scope of their employment. These plaintiffs need not hence invoke a waiver of immunity to maintain their claims.

■■■ A review of other sections of the Governmental Tort Claims Act is also helpful in our effort to determine the legislative intent. Section 156(G) mandates that claims against resident physicians or interns shall be made in accordance with Titles 12 (civil procedure) and 76 (torts) of the Oklahoma Statutes.[28] Section 163 [29] provides that resident physicians can be sued individually, notwithstanding their status as employees. Section 154(D) limits their liability to $100,000.[30] These sections recognize the special burdens (financial amongst others) faced by student

---

25. *See Lancaster, supra* note 22, 426 P.2d at 716. In *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–592, 7 L.Ed.2d 492 (1962), while explaining the factors to be considered when a statute is interpreted, the Court reasoned:
    "We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'" [Citations omitted.]

26. *Lancaster, supra* note 22, 426 P.2d at 716; *LeFlore v. Reflections of Tulsa, Inc.,* Okl., 708 P.2d 1068, 1075 (1985).

27. The exemptions set forth in 51 O.S.1991 § 155 address circumstances where the state expressly retains its sovereign immunity. The terms of § 155 provide that the state or a political subdivision shall not be liable if a loss or claim results from any one of thirty specified activities of the sovereign or its agents.

28. The terms of 51 O.S.Supp.1986 § 156(G) (eff. July 1, 1986) are:
    "G. Claims and *suits against resident physicians* or interns shall be made in accordance with the provisions of Titles 12 and 76 of the Oklahoma Statutes."
    The only change made in § 156 by the 1986 amendment was the addition of subsection G. The quoted language was not changed by the 1988 and 1992 amendments.

29. The terms of 51 O.S.1991 § 163(C), which have not been amended since July 1, 1986, provide:
    "C. Suits instituted pursuant to the provisions of this act shall name as defendant the state or the political subdivision against which liability is sought to be established. In no instance shall an employee of the state or political subdivision acting within the scope of his employment be named as defendant *with the exception that suits based on the conduct of resident physicians and interns shall be made against the individual consistent with the provisions of Title 12 of the Oklahoma Statutes."* [Emphasis added.]
    The only change made in § 163 by the 1986 amendment was the addition of the emphasized provision.

30. Liability limitations in the act are set out in 51 O.S.Supp.1986 § 154 (eff. July 1, 1986). Section 154(D) provides:
    "D. The total liability of resident physicians and interns while participating in a graduate medical education program of the University of Oklahoma College of Medicine, its affiliated institutions and the Oklahoma College of Osteopathic Medicine and Surgery shall not exceed One Hundred Thousand Dollars ($100,-000.00)."
    The only change made in § 154 by the 1986 amendment was the addition of subsection D. The quoted language was not changed by the 1988, 1990 and 1991 amendments.

physicians and make some accommodations to protect them should they be called upon to defend against a lawsuit. That the legislature felt a need to protect residents in this special manner indicates *an underlying intent* to subject faculty and student physicians to individual liability for torts committed while practising medicine.[31]

■ A statutory grant of immunity must be explicit—immunity will not be divined from a legislative text that is silent, doubtful or ambiguous.[32] According to the defendants' interpretation, the act would afford sovereign immunity to both the state and the individual physicians for medical malpractice in an educational setting and would deny the plaintiffs all avenues of recourse. This construction is unsupportable. The provisions of § 152 specifically remove from the scope of governmental immunity those acts of physician educators and students which fall under the rubric of medical practice. For these acts the physician educators and students are subject to individual tort liability.

The dissent's response to this analysis relies on an artificial distinction between "private patients" and "state patients" and urges that governmental immunity shields physicians from liability arising only from treatment of the latter.[33] The plain language of the statute does not support the dissent's interpretation. Had the legislature intended to differentiate between medical treatment rendered to a "state's patient" and that given to a private patient, it could easily have done

so in § 152(5). The statutory text clearly fails to distinguish between (a) medical treatment arising from a physician's role in the educational process and (b) medical practice arising from non-educational activities.

■ No one questions that practical "hands-on" experience is widely utilized as a component of medical training. Nonetheless, the legislature, in enacting § 152(5), declined to provide *absolute* immunity to physicians rendering medical care to state patients. Nothing in the statute calls on us to *dichotomize* malpractice patients based on their wealth or to *assess* the physician's economic motivation in extending the service for which recovery is sought.

## III

**STATUTORY CLASSIFICATION OF PHYSICIANS AS PERSONS WHO ARE INDIVIDUALLY LIABLE FOR TORTS COMMITTED WHILE PRACTISING MEDICINE DOES NOT VIOLATE EQUAL PROTECTION**

The defendant physicians argue that allowing treating physicians to be individually liable would be an "arbitrary exercise of legislative discretion". They assert their placement into a class different from other state employees, who are not exposed to personal liability for tortious conduct, constitutes arbitrary and disparate treatment of similarly situated individuals, which will not pass muster under the Equal Protection Clause.

---

**31.** This court will not assume that the legislature has done a vain or useless act; it must interpret legislation so as to give effect to every word and sentence rather than rendering some provisions nugatory. *Strelecki v. Oklahoma Tax Commission*, Okl., 872 P.2d 910, 920 n. 69 (1994); *Rodgers v. Higgins*, Okl., 871 P.2d 398, 409 (1994); *In re Supreme Court Adjudication, Etc.*, Okl., 597 P.2d 1208, 1210 (1979); *TWA v. McKinley*, Okl., 749 P.2d 108, 110 (1988); *Anderson v. O'Donoghue*, Okl., 677 P.2d 648, 651 (1983); *Thompson v. Ekberg*, Okl., 613 P.2d 466, 467 (1980); *AMF Tubescope Co. v. Hatchel*, Okl., 547 P.2d 374, 379 (1976). Were we to extend absolute immunity to the defendant physicians, those provisions in the Governmental Tort Claims Act [§ 163(C), *supra* note 29] which allow suits to be brought against resident physicians and interns would be literally nullified.

**32.** *Ingram v. State*, Okl., 786 P.2d 77, 80 (1990); *Gunn, supra* note 15, 839 P.2d at 1349; *Huff v. State*, Okl., 764 P.2d 183, 185 (1988); *Jarvis v. City of Stillwater*, Okl., 669 P.2d 1108, 1111 (1983) (both *Huff* and *Jarvis* were abrogated by statute on other grounds, see *Bolin v. State*, Okl. App., 838 P.2d 29, 30 (1992)).

**33.** The dissent proposes a definition of medical practice that would vary with the patient's economic status. Treating *nonpaying patients* (the state's patients) would be included within the concept of "teaching" medicine, while caring for *paying patients* (the *faculty physician's* private patients) would be "practising" medicine. Under this dichotomy paying patients could invoke *unlimited* liability for negligence, but nonpaying patients would be kept within the *statutory recovery limits*.

■■■■ The United States Supreme Court's constitutional jurisprudence teaches that an "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right [such as the right to vote, the right of interstate travel, rights guaranteed by the First Amendment, or the right to procreate] or operates to the peculiar disadvantage of a suspect class [such as a class based on race, alienage or ancestry]."[34] Because we are dealing with neither a suspect classification nor an infringement upon a fundamental right, the rational-basis standard of review governs here.[35] Applying the rational-basis test, we conclude that the dichotomous division of tortfeasors into private and public categories rests on a legitimate state interest and does not offend constitutional restrictions on the legislative use of classification criteria.[36] Where a legitimate state purpose is achieved by statutory means that does not violate the relatively relaxed standard of minimal rationality, the classification scheme may pass constitutional muster.[37]

■■■■ Public torts constitutes a new body of law created by and dependent on the legislature.[38] It is within the power of the legislature to advance public policy by creating a dichotomy of duties these defendants are called upon to perform and excluding from immunity those activities which fall under the rubric of practising medicine while including those of purely classroom teaching.

The defendant physicians argue that the § 154(D) liability limitation pertains to the state's total liability and that a statutory interpretation affording absolute immunity to faculty physicians while burdening resident and intern physicians with $100,000.00 personal liability would be unconstitutional. Because we hold today that both resident physicians and faculty physicians are individually liable for medical malpractice, this question is moot. The parties have *not* tendered the issue whether the § 154(D)'s liability cap of $100,000.00 is fraught with constitutional infirmity because it protects only resident and intern physicians while faculty doctors stand subject to unlimited personal liability. We express no opinion concerning this question.

## IV

## CONCLUSION

The language of the Governmental Tort Claims Act is clear—faculty physicians en-

**34.** *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976), citing *San Antonio School District v. Rodriguez,* 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973). The Court defined a suspect class as one that is "saddled with such disabilities, or subjected to such history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.,* 427 U.S. at 313, 96 S.Ct. at 2566.

**35.** When called upon to analyze a case on equal-protection grounds, a court will apply one of three standards of review: (a) rational basis, (b) heightened scrutiny, or (c) strict scrutiny. If the classification does not involve a suspect class or abridge a fundamental right, the rational-basis test is used. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Under the rational-basis standard of review, the Court will uphold a statutory classification if a rational relationship exists between that classification and the state interest. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *Cleburne, supra,* 473 U.S. at 440, 105 S.Ct. at 3254. Legislative classifications based on gender or ille-

gitimacy call for the heightened standard of review. Under this test a law must be substantially related to an important governmental interest. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976); *Cleburne, supra,* 473 U.S. at 440, 105 S.Ct. at 3255.

**36.** *See in this connection Black v. Ball Janitorial Service, Inc.,* Okl., 730 P.2d 510, 513 (1986); *Reirdon v. Wilburton Board of Education,* Okl., 611 P.2d 239, 240 (1980). *See also Wilson v. Gipson,* Okl., 753 P.2d 1349, 1351 (1988), which teaches that limits on damages recoverable from governmental entities serve a legitimate governmental purpose.

**37.** *Ross v. Peters,* Okl., 846 P.2d 1107, 1117 (1993).

**38.** In *Vanderpool, supra* note 14, we abrogated the common-law doctrine of sovereign immunity and invited the legislature to fill the void by statute. In shaping the state's public law of tort liability, the legislature enjoys extremely broad powers. *See Black, supra* note 36, 730 P.2d at 513, which teaches that in crafting public tort law, the legislature appears free from equal protection and state constitutional restraints.

gaged in teaching or in administrative duties and resident physicians and interns participating in a graduate medical education program are employees of the state acting within the scope of their employment *unless they are practising medicine.* The claims before us arose *from the treatment of patients, not from acts of teaching or learning.* Although the defendants may have been functioning as professors or students when the tortious conduct occurred, *they were also rendering medical services by engaging in the healing art.* When a patient is introduced into the clinical setting, the emphasis shifts from instruction of medical students to treatment of illness— the physician's care of the patient becomes the definitive and controlling nexus of the activity. The legislature has broad power in crafting the state's public tort law. Its intent *not to shield* with immunity the individual physician in these defendant doctors' status is clear.

We hold that the purview of protection from liability created by the Governmental Tort Claims Act does not encompass the activities of practising medicine or providing treatment to patients.[39]

**THE TRIAL COURT'S SUMMARY JUDGMENTS IN NO. 79,507 AND NO. 79,517 ARE REVERSED AND THE CAUSES REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS PRONOUNCEMENT.**

LAVENDER, V.C.J., and SIMMS, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

HODGES, C.J., and WATT, J., dissent.

HARGRAVE, J., not participating.

WATT, Justice, with whom HODGES, C.J., joins, dissenting:

I respectfully disagree with the majority's conclusion that the defendant faculty physicians, resident physicians and interns were acting outside of the scope of their employment as state employees when their alleged acts of malpractice occurred. As with the majority, my opinion is grounded on the interpretation of a state "employee" under 51 O.S.Supp.1986 § 152(5). However, it is my opinion that because the actions of the defendant doctors' in the present cases would not have been performed *but for their status as faculty physicians and students participating in an educational program at OUHSC,* their acts must be considered those of state employees under Title 51.

Under § 152(5), the Legislature preserved governmental immunity for itself for tortious acts committed by physicians, residents or interns "while practicing medicine or providing medical treatment to patients." Section 152(5) also provides that faculty physicians "engaged in their teaching duties" and residents and interns "participating in a graduate medical education program" are employees of the state. As the majority notes, the activities of the defendant doctors include both elements of practicing medicine and teaching or participating in an educational program. To determine which element controls the outcome of these cases, we must examine the principle purpose underlying the doctors' motivation for acting in the first place.

The state employs faculty physicians to instruct and train young doctors and those

---

**39.** The plaintiffs in Cause No. 79,517 (the *Anderson* claim) raise a number of additional issues to support their assertion that the trial court erred in giving summary judgment to the defendant physicians. These include: (1) Were the defendant physicians estopped from raising the defense of immunity from liability, or did they waive their immunity, because they did not raise it in their initial pleading? (2) Is the physicians' immunity from liability unconstitutional because it denies the plaintiffs access to the courts and a remedy to redress a wrong? and (3) Does the physicians' immunity violate the state and federal constitutions by creating a special class? The plaintiffs in Cause No. 79,507 (the

*Bhat* claim) also raise other issues: (1) Did the defendant physicians waive their immunity by engaging in willful and wanton or grossly negligent acts? (2) Is the immunity of these defendants waived to the extent of professional malpractice insurance coverage purchased for them by the state? and (3) Does immunity extend to those acts of these physicians which are not governmental policy decisions? Because *our decision today establishes that these physicians, while practising medicine in the teaching institutions of the state, do not enjoy immunity from tort liability,* we need not address any of these tendered issues.

seeking to become specialists. By necessity, an essential portion of that educational process must take place in a clinical setting where patients are treated. Teaching, training *and treatment* go hand-in-hand and all are integral components of the medical educational process. The State of Oklahoma is well aware of this fact and it expects, even requires, its employee faculty physicians to perform *all* of these duties. When a faculty physician is engaged in instructing students, the making of rounds, performance of surgery or otherwise treating of the *state's patients* does not alter the doctor's status as that of a teacher. These tasks are certainly what the state pays the faculty member to do and something the doctor would not do but for his state salary. Consequently, those actions should not be deemed "practicing medicine or providing medical treatment to patients" under § 152(5).

A different conclusion is reached when a faculty physician treats *private patients*. If a physician, who happens to be a faculty member at a teaching hospital, provides care or treatment to a private patient, he or she generally does so in return for payment from the patient. The doctor does not perform such duties in return for renumeration by the state. In such a case, the faculty member has the same relationship with the patient as any other doctor has with a private patient. Despite his affiliation with the state, a faculty physician's work with private patients is clearly "practicing medicine or providing treatment to patients" within the meaning of § 152(5). And while a faculty physician may provide clinical training while treating a private patient, his reason for having undertaken the treatment in the first place was that the patient retained him, not that he is a teacher for the state.

The rationale applicable to faculty physicians engaged in teaching duties applies to resident physicians and interns participating in a graduate medical education program. Again, the state understands that the treatment of patients is an indispensable component of the medical education process. The state similarly requires that residents and interns treat state patients as part of their scholastic responsibilities. Residents and interns would not conduct such acts were they not employed by the state to do so. Accordingly, their actions in treating the state's patients should be deemed a part of their educational process and not the practice of medicine under § 152(5).

In conclusion, I believe that the lower courts properly granted summary judgment to the defendant doctors in these two cases. Although the doctors were engaged in both practicing medicine and teaching/participating in an educational program, they would not have so acted were they not paid to do so as part of their duties as state employees. Pursuant to 51 O.S.Supp.1986 § 152(5), the doctors should be shielded from suit.